THE TROY UNION RAILROAD COMPANY, Plaintiff, *v.* THE CITY OF TROY, Defendant.

Supreme Court, Rensselaer County, December 31, 1927.

**Taxation — action to recover excess taxes — plaintiff was organized in 1851 — defendant agreed to exempt plaintiff from taxation except to amount of capital stock — Laws of 1853, chap. 462, provided for said exemption — later, new contract was made providing that if prior statute exempting plaintiff from taxation should be repealed, defendant would seek enactment of new statute, and if not passed, defendant would refund taxes — Laws of 1909, chap. 201, repealed exemption statute — city had no power to exempt plaintiff from taxation — city is not estopped from pleading ultra vires of contract.**

This action was brought to recover excess taxes alleged to have been paid by the plaintiff to the defendant for the years 1911 to 1921. The claim of refund is based upon two contracts. The plaintiff was organized in 1851 and its stock was held by other railroad companies. Shortly after its organization the defendant and the plaintiff and the other railroad companies entered into an agreement whereby the defendant agreed to apply to the Legislature to exempt the plaintiff from taxation upon any amount in excess of its capital stock, and, further, that in case the Legislature should not pass such a statute, the city would refund an amount equal to the city taxes for any valuation exceeding the then capital stock of the plaintiff.

Chapter 462 of the Laws of 1853 was enacted, which exempted the plaintiff from
  taxation in excess of the amount of its capital stock.  Financial difficulties
  arose, and in the settlement thereof the first contract was annulled and a new
  contract was made in 1858, which provided that if chapter 462 of the Laws
  of 1853 should be repealed the defendant would apply to the Legislature for
  the enactment of another statute exempting the plaintiff from taxation upon an
  amount exceeding the amount of its capital stock, and that if such a statute
  should not be enacted, the defendant would refund to the plaintiff an amount
  equal to taxes imposed upon the plaintiff for any valuation exceeding its then
  capital stock.
Chapter 201 of the Laws of 1909 repealed the exemption statute of 1853, and
  since then the plaintiff's property has been assessed in excess of its capital
  stock.  The plaintiff contends that it is entitled to recover the taxes which it
  has paid on said assessment in excess of the amount of its capital stock.
The contract between the defendant and the plaintiff was *ultra vires*, for the
  defendant had no power to grant exemptions from taxation nor to make a
  contract for that purpose.
The contention of the plaintiff, that the defendant is estopped from pleading
  *ultra vires*, cannot be sustained, for it does not appear that the plaintiff gave
  an equivalent to the city for the taxes from which the contract purports to
  exempt it.  In the absence of any such showing, the contract cannot be enforced
  and the defendant is not estopped from pleading *ultra vires*.
Furthermore, the plea of estoppel is equitable, and the plaintiff has not shown
  that in equity the defendant can be estopped from pleading *ultra vires*.

THIS action was brought to recover $288,249.59 with interest
upon various portions thereof from different dates, the claim being
made that this sum was due for and because of " excess taxes it
has paid " to the city of Troy in each of the years 1911 to 1921,
both inclusive, and which it asks shall be refunded by the city.

The so-called " excess " is the excess of taxes paid upon a valuation
of the plaintiff's property over and above the sum of $30,000, which
is the amount of the capital stock of the company.  The valuations
placed upon the tangible property in the years named were
$1,000,000 in some years, and $1,003,000 in others, besides which
there were assessments made by the State Board of Tax Commis-
sioners as special franchise assessments upon the railroad property
of the company in the public streets.

The claim of refund is based upon two contracts — one dated
December 3, 1852, between the Mayor, Recorder, Aldermen and
Commonalty of the City of Troy, party of the first part, and the
Troy Union Railroad Company, the Rensselaer and Saratoga
Railroad Company, the Schenectady and Troy Railroad Company,
the Hudson River Railroad Company, and the Troy and Boston
Railroad Company, parties of the second, third, fourth, fifth and
sixth parts, respectively; and the other the contract dated July
1, 1858, by and between the same parties, except that the
Schenectady and Troy Railroad Company was not a party to this

contract (its railroad having been sold in the meantime), and, instead, the New York Central Railroad Company was a party.

In and prior to 1851 four railroad companies were operating in the city of Troy, viz., the four companies named in the contract of 1852, the Hudson River Railroad Company operating under lease from the Troy and Greenbush Railroad Association.

Their cars were all run into and out of the city upon a single track which was laid in River street, the principal business thoroughfare. The cars were drawn through this street by horses. Each company had its own passenger station located in or near that street, and its own stable equipment. The construction of the Troy and Boston Railroad Company was not commenced in the city until the summer of 1850. The method of operation was hampering to the railroads and interfered more or less with free movement through that street.

In 1851 an act was passed by the Legislature, chapter 255, which was entitled: " An Act to authorize the city of Troy and certain railroad corporations to subscribe for and become the owners of stock for the construction of a railroad through the whole or some portion of the city of Troy." Section 1 of this chapter reads as follows: " The corporation of the city of Troy, and the several railroad corporations whose railroads now or hereafter shall come to the city of Troy, or which have or shall have their business terminus in, or run their trains to and from said city, may subscribe for and become the owners of stock in a railroad corporation to be organized under the act entitled, ' An act to to authorize the formation of railroad corporations and to regulate the same,' passed April second, one thousand eight hundred and fifty, for the construction of a railroad, with one or more tracks, through the whole or a portion of said city; but there shall not be more than one railroad through that part of the city of Troy lying between Adams and Federal streets. The corporation of the city of Troy shall not subscribe for or take more than one-fourth part of the capital stock of the corporation to be organized."

It was provided in section 2 that the city of Troy be authorized to borrow upon the bonds of the city a sum not exceeding the cost of the construction of such railroad, but that no bonds should be issued by the city until the city shall, by the several railroad companies which are authorized to subscribe for stock by the first section of the act, and also by a mortgage on the railroad so to be constructed, its capital stock and franchises, be fully indemnified and made harmless against the payment of any bonds and the interest thereon which the city might issue under the authority of the act.

Section 3 reads as follows: " All railroads which now or hereafter shall have their trains running from the city of Troy may, on equal terms and with equal privileges, use the railroad track or tracks hereby authorized to be constructed, and shall be entitled to at least two directors in said railroad corporation, who shall be residents of the city of Troy."

Pursuant to this act, the Troy Union Railroad Company, under date of July 21, 1851, filed articles of incorporation in the office of the Secretary of State, which declared that the corporation was formed under the General Railroad Act of 1850; that the amount of the capital stock was to be $30,000, and that twenty-six persons each subscribed for one share of stock, and the city of Troy subscribed for six shares. The company commenced the transaction of its business shortly after the filing of these articles of incorporation and it proceeded during the years 1851 and 1852 to make and enter into contracts for the purchase of the necessary land and the construction of the railroad and the union passenger station in the city. The road was completed and put in operation in February, 1854; and thereupon the railroad in River street was removed. Thereafter all trains entering into and leaving Troy were operated over the tracks of the Troy Union Railroad Company by locomotives, and a single union passenger station was used by all the companies.

During the period of construction the city of Troy issued its bonds from time to time, to the extent of $707,000, which sum was paid over to the Troy Union Railroad Company, and used by it for its corporate purposes. The new railroad was built mainly across the public streets; with the exception in Sixth street, leading to and from the union station, a portion was used lengthwise.

On December 3, 1852, a contract was entered into between the city and the railroad companies relative, among other things, to the location, management and use of the railroad, and a provision was inserted therein which reads:

" The party of the first part agrees that the Common Council of the city of Troy shall join in an application to the Legislature of the State of New York, that the Troy Union Railroad Company be exempt from taxation upon an amount exceeding the present amount of its capital stock, and that no tax shall be imposed upon the Rensselaer and Saratoga Railroad Company on account of the proposed addition to the said bridge. And if such law shall not be passed the Common Council of the city of Troy shall refund to the Troy Union Railroad Company an amount equal to the city taxes imposed on the Troy Union Railroad Company for any valuation exceeding its present capital stock; and shall also refund

to the Rensselaer and Saratoga Railroad Company an amount equal to the city taxes imposed on the Rensselaer and Saratoga Railroad Company on account of the said bridge for any valuation exceeding the present valuation."

On June 24, 1853, the Legislature passed chapter 462 of the laws of that year which was entitled: "An act providing for the taxation of the property of the Union Railroad Company in Troy." The first section of this act reads as follows: " § 1. For the purposes of taxation in the city of Troy, and in the county of Rensselaer, the property of the Troy Union Railroad Company shall be estimated and assessed (as the common council of said city of Troy, by its contract with said company, dated December third, eighteen hundred and fifty-two, agreed that the same should be) at the amount of the capital stock of said company, and no more; and (as agreed in the said contract) the bridge of the Rensselaer and Saratoga Railroad Company over the Hudson river at Troy shall, for the purpose of taxation, not be estimated or assessed at any increased valuation by reason of the addition thereto, agreed for in said contract."

This act became commonly known as the Exemption Act.

All the stock of the Troy Union Railroad Company (including the six shares issued to the city of Troy and which were returned to the company) became and ever since have been owned by the several railroad companies which were and have continued to be the constituent companies of the Troy Union Railroad Company.

The companies which executed indemnity bonds to the city of Troy, as required by the act of 1851, defaulted in payment of interest on the bonds; besides which internal differences arose between the companies. The city, therefore, commenced an action for the foreclosure of the mortgage given to it by the Troy Union Railroad Company and the constituent companies. It does not appear whether this action went to judgment; but in 1858 a new agreement was entered into between the city and the several railroad companies by which, among other things, the city surrendered a substantial portion of the moneys due or to fall due to it upon the indemnity bonds, and provided as follows:

" *Eleventh.* The party of the first part agrees, that if the law passed by the Legislature of the State of New York, June 24, 1853, relative to the taxation of the property of the Troy Union Railroad Company in Troy, shall, at any time be repealed, the Common Council of the city of Troy shall join in an application to the Legislature of the State of New York, that the Troy Union Railroad Company be exempt from taxation upon an amount exceeding the present amount of its capital stock; and that no tax be imposed

upon the Rensselaer and Saratoga Railroad Company on account of the proposed addition to the said bridge, and if such law shall not be passed, the Common Council of the city of Troy, shall refund to the Troy Union Railroad Company, an amount equal to the city taxes imposed upon the Troy Union Railroad Company, for any valuation exceeding its present capital stock. * * * "

From 1853 to 1886 the assessors of Troy assessed the property of the railroad company at a valuation of $30,000. In the last named year the assessors increased this valuation to the sum of $783,984. Thereupon a certiorari proceeding was brought against the assessors to have this assessment set aside. This the court directed, and judgment was entered by which the assessment was declared " illegal and erroneous, by reason of overvaluation, the valuation having been fixed and established by law for the purposes of taxation at not to exceed $30,000." An appeal was taken by the assessors from this judgment, and the judgment was affirmed by the General Term of the Supreme Court. (*People ex rel. Troy Union Railroad Company* v. *Carter*, 52 Hun, 458.)

Referring to the act of 1853, the court said: " Whether it is wise for the Legislature to pass acts exempting certain property from taxation is not for us to say. * * *

" While this act has the form of fixing the amount at which the company is to be assessed, it is practically an act that all property of the company beyond that amount shall be exempt. This may be unjust to other persons, natural and artificial, in the State, but the injustice, if any, is one that we cannot redress. The power is in the Legislature."

This judgment was affirmed by the Court of Appeals without opinion in 117 New York, 625. The assessors thereafter assessed the railroad property at a valuation of only $30,000. This continued until the Legislature passed an act in 1909, chapter 201, by which the Exemption Act of 1853 was repealed. In 1911 the assessors placed a valuation upon the railroad property of $1,000,000. Thereupon the Troy Union Railroad Company and the New York Central and Hudson River Railroad Company commenced two certiorari proceedings to have this assessment declared illegal and erroneous. The contentions of the companies were that the court had found, in the *Carter* case, that the contract of 1858 was entered into " for a valuable consideration," and that the Repealing Act of 1909 was null and void in that it contravened that provision of the Constitution of the United States, subdivision 1, section 10, article 1, which prohibits a State from passing any law impairing the obligation of contracts. On the report of the referee and the hearing upon his findings before Mr. Justice CHESTER at Special Term, judgments

were entered adversely to the relators, the court holding that the Repealing Act was a valid act, and dismissing the writs. (*People ex rel. N. Y. Central & Hudson R. R. R. Co.* v. *Mealy* and *People ex rel. Troy Union R. R. Co.* v. *Mealy*, 88 Misc. 649.) An appeal was taken to the Appellate Division of the Supreme Court, Third Department, from the final order, and judgments of the Special Term were affirmed on the opinion of Chester, J. (179 App. Div. 951). The relators then appealed to the Court of Appeals and there the order in each case was unanimously affirmed (224 N. Y. 187). The relators then sued out a writ of error so as to bring the case to the Supreme Court of the United States, and in that court the judgment of the Court of Appeals was affirmed (254 U. S. 47). All the courts held that the Exemption Act of 1853 was not based upon any consideration running to the State of New York, and that the exemption was merely a privilege or favor granted to the railroad company, which it was within the power of the State to withdraw at any time. However, both the Court of Appeals and the United States Supreme Court stated in their opinions that they did not pass upon the question whether the city was liable under its covenant in the contract of 1858 to refund to the railroad company an amount equal to the city taxes imposed upon the company for any valuation exceeding $30,000 in case the Repealing Act of 1909 should be held to be valid. This action was thereupon commenced to recover the excess in taxes which had been paid under protest. The case was heard before Mr. Justice Hasbrouck at the Rensselaer Trial Term in July, 1927. The plaintiff and the constituent companies contended that they had given up a right to operate in River street, and that this constituted a valuable consideration for the partial exemption of their property from taxation; while the defendant contended that the contracts of 1852 and 1858 were without any valuable consideration moving to the city; that the companies voluntarily retired from the use of River street to their great advantage; that it was not the city that compelled the railroads to cease operation on River street, but it was in effect a command of the statute of 1851; that the finding of Mr. Justice Edwards in the *Carter* case that the contract was entered into for a valuable consideration was not necessary to the determination of that proceeding and was not incorporated in the judgment; that if the exemption provision was sustained it would continue for all time, and was a wasteful, extravagant and unconscionable contract; and that the contracts were *ultra vires* in that neither the common council nor any officer of the city was empowered by statute or otherwise to exempt the property from taxation in whole or in part, or agree to a refund or return of

taxes which had been paid into the city treasury pursuant to a valid assessment.

*Lewis E. Carr* [*Whalen, Murphy, McNamee & Creble* of counsel], for the plaintiff.

*Edward J. Donohue* [*William J. Roche, William C. Roche* and *John T. Norton* of counsel], for the defendant.

HASBROUCK, J.    The municipal corporation now known as the city of Troy was incorporated by chapter 121 of the Laws of 1816 by the corporate title " The Mayor, Recorder, Aldermen and Commonalty of the City of Troy."

By that act the common council was constituted the commissioners of highways in said city and given power to pass ordinances, among other things, to regulate the streets and highways in such city.

In the year 1851 there were four railroad corporations — the Rensselaer and Saratoga; the Schenectady and Troy; the Hudson River and the Troy and Boston — which had and used railroad tracks on River street in the city of Troy and operated their cars thereon by horse power.

One of these companies, the Rensselaer and Saratoga, had its terminus at the end of its bridge, now the Delaware and Hudson bridge, on the easterly side of River street at Federal street; the Schenectady and Troy had its terminus at the west end of said bridge; the Troy and Boston had its terminus at the north side of Hoosick street, and the Hudson River terminus was the intersection of the Troy Union Railroad Company with the Troy and Greenbush Railroad Company.

The Troy Union Railroad Company was organized July 21, 1851, in pursuance of chapter 255 of the laws of that year, which provided among other things: " The corporation of the city of Troy, and the several railroad corporations whose railroads now or hereafter shall come to the city of Troy, or which have or shall have their business terminus in, or run their trains to and from said city, may subscribe for and become the owners of stock in a railroad corporation to be organized under " the general railroad act.

Pursuant to the power so conferred the plaintiff, the Troy Union Railroad Company, was organized with a capital stock of $30,000.

On the 3d of December, 1852, there was a contract entered into between the Mayor, Recorder, Aldermen and Commonalty of the City of Troy and the Troy Union Railroad Company and its four constituent stockholders.

The substance of the contract was that there should be one railroad running through the city of Troy, that of the Troy Union Railroad

Company; that the defendant, the City of Troy, should consent to the construction and operation of the railroad across certain of its streets and along Sixth avenue; that the city of Troy should loan its credit to the Troy Union Railroad Company to the extent of the cost of the railroad on the new line; that the Troy Union Railroad Company should give a mortgage to secure such loan, and that " The party of the first part agrees that the Common Council of the City of Troy shall join in an application to the Legislature of the State of New York that the Troy Union Railroad Company be exempt from taxation upon an amount exceeding the then present amount of its capital stock ($30,000) and if such law shall not be passed the Common Council shall refund to the Troy Union Railroad Company the amount equal to the city taxes imposed on the Troy Union Railroad Company for any valuation exceeding its capital stock."

Under this agreement there were mortgages given amounting in all to something in excess of $707,000. The four constituent companies agreed each to pay one-fourth of the mortgage debt to the city.

The Troy Union Railroad Company further agreed to construct a railroad with two or more tracks upon the courses and routes indicated by the survey attached to the contract, and to furnish all necessary police regulations for the tracks and passenger house.

In 1853, by chapter 462 of the laws of that year, it was enacted that " For the purposes of taxation in the city of Troy, and in the county of Rensselaer, the property of the Troy Union Railroad Company shall be estimated and assessed (as the common council of said city of Troy, by its contract with said company, dated December third, eighteen hundred and fifty-two, agreed that the same should be) at the amount of the capital stock of said company, and no more."

The contract of 1852 continued until default was made in certain payments required by the mortgage. A second contract was made July 1, 1858, by the terms of which the former contract was annulled and the city agreed, among other things, that the Troy Union Railroad Company might continue to maintain and operate its railroad in the city of Troy as located and constructed, and further " That if the law passed by the Legislature of the State of New York, June 24, 1853, relative to the taxation of the property of the Union Railroad Company in Troy, shall at any time be repealed, the Common Council of the City of Troy shall join in an application to the Legislature of the State of New York, that the Troy Union Railroad Company be exempt from taxation upon an amount exceeding the present amount of its capital stock   *   *   *

and if such law not be passed, the Common Council of the City of Troy shall refund to the Troy Union Railroad Company an amount equal to the city taxes imposed upon the Troy Union Railroad Company for any valuation exceeding its present capital stock." (See 26 R. C. L. § 264, p. 300; 60 L. R. A. 55.)

It was a further provision of the contract that in case of the failure of the constituent railroad companies who were parties to the contract to pay any of the installments of the principal or interest of the mortgage to the city of Troy, the right of such defaulting railroad company to use said Troy Union Railroad Company's tracks and other property, should cease and thereupon its title and interest in said union railroad should vest in the city of Troy.

In 1886 the assessors of the city of Troy made an assessment against the property of the Troy Union Railroad Company in the sum of $783,984. A writ of certiorari was sued out and a review was had in which it was held that the assessment was improperly made and not in accordance with the law of 1853.

In 1901 the mortgage of the Troy Union Railroad Company and its constituent stockholders to the city of Troy was satisfied.

In 1909 the Legislature passed an act repealing the Exemption Act of 1853 (Laws of 1909, chap. 201). Then the assessors of the city of Troy in 1911 made an assessment against the property of the plaintiff of $1,000,000 and against the special franchise for $215,400. A review was had of these assessments in the case of *People ex rel. N. Y. C. & H. R. R. R. Co.* v. *Mealy,* and the question was tried out in that litigation as to whether the repealing act constituted an impairment of any contractual obligation upon the part of the city to the Troy Union Railroad Company and its constituent stockholders. The case went to the Court of Appeals (224 N. Y. 187) and the United States Supreme Court (254 U. S. 47), and was decided finally in favor of the assessors that the contract obligation had not been impaired.

Both the Court of Appeals and the United States Supreme Court were particular in their opinions to say that they did not pass upon the question as to the liability of the city to refund taxes under the contract of 1858 upon assessments exceeding $30,000.

Since 1911 the assessors have assessed the property of the plaintiff at its full value. The plaintiff has paid the taxes under protest. In 1921 the plaintiff, following the suggestion of the United States Supreme Court as to remedy, brought its action on the covenant contained in paragraph XI against the defendant to recover the sum of $288,241.59 for taxes paid since then up to the time of the commencement of the action.

The answer of the defendant to the contract is that it is *ultra vires.*

It is well established in the law that a municipality exercises merely delegated powers from the State to levy and collect taxes. It has no power to grant exemptions from taxation nor to make contracts looking to that result. (*Brooklyn, Q. C. & S. R. R. Co.* v. *City of New York*, 229 N. Y. 260, 266; *People ex rel. Sweet* v. *Board of Supervisors*, 101 App. Div. 327; Dillon Mun. Corp. [5th ed.] § 1610; *Chicago, R. I. & P. R. Co.* v. *Union Pacific R. Co.*, 47 Fed. 15, 21.)

The challenge of the city is met by the railroad company with the contention that it has in good faith performed the contract of 1858, that the city has had substantial benefits therefrom and is estopped from claiming or proving its inability to make the contract.

The principle of estoppel has had wide use in this State as an answer to the plea of *ultra vires*. (*City of Buffalo* v. *Balcom*, 134 N. Y. 532; *Mayor, etc., of N. Y.* v. *Sonneborn*, 113 id. 423, 426; *Moore* v. *Mayor*, 73 id. 238; *Vought* v. *Eastern Bldg. & Loan Association*, 172 id. 508, 517.)

Under the circumstances of the case at bar estoppel cannot be availed of to overcome the plea of *ultra vires*, and this is said in the face of the determination in the *Carter* case that there was a valuable consideration for the contract of 1858, and conceding that contract to be a modification of that of 1852. (*American Mfg. Co.* v. *Helena Hardware Co.*, 119 Ark. 282; *People ex rel. Troy Union R. R. Co.* v. *Mealy*, 254 U. S. 47.)

In this case it is not enough that there be valuable consideration. The public interest requires that property assessable should bear its proportionate burden of support of the State.

In all of the cases which hold that an agreement may be made by a city for exemption from taxes it appears that an equivalent in money or services was rendered to such city. (*Maine Water Co.* v. *City of Waterville*, 93 Maine, 586; *Cartersville Improvement, Gas & Water Co.* v. *Mayor*, 89 Ga. 683; *Hampton Beach Improvement Co.* v. *Town of Hampton*, 77 N. H. 373; L. R. A. 1915C, 698; *Grant* v. *City of Davenport*, 36 Iowa, 396; *Utica Water-Works Co.* v. *City of Utica*, 31 Hun, 426; 26 R. C. L. § 262, p. 297; *City of N. Y.* v. *Brooklyn, Q. C. & S. R. R. Co.*, 156 App. Div. 856.)

If there be no payment of taxes or the equivalent of them, then the public interest is flouted and public policy is set at naught. A quotation from Alexander Hamilton in the Federalist reveals the sensitiveness of government to the loss of power to tax: " Money is with propriety considered as the vital principle of the body politic; as that which sustains its life * * * enables it to perform its most essential functions. A complete power, therefore, to procure a regular and adequate supply of it * * * may be

regarded as an indispensable ingredient in every constitution. From a deficiency in this particular, one of two evils must ensue; either the people must be subjected to continual plunder as a substitute for a more eligible mode of supplying the public wants, or the government must sink into a fatal atrophy, and, in a short course of time, perish." (Federalist, No. XXX, Hamilton.)

Neither the contract of 1852 nor the contract of 1858 contains any provision for the rendition to the city of an equivalent for future taxes.

The considerations moving to the city generally speaking under the first contract were but three. Of the three but one is mentioned in such contract, viz., 3, hereinafter set forth.

1. The removal of the tracks of the four railroad companies from River street. This consideration did not move from the defendant but from the four companies which had and used rights or privileges in such street. Ample consideration for the surrender of such rights and privileges was granted the plaintiff by the consent of the city to lay tracks in other streets. (*Brooklyn, Q. C. & S. R. R. Co.* v. *City of New York,* 229 N. Y. 260, 266; *Travelers' Ins. Co.* v. *Mayor,* 99 Fed. 663, 668, citing *Memphis, K. & C. Railway Co.* v. *Thompson,* 24 Kan. 170.)

2. Under the contract the plaintiff assumed the risk of expending $707,000 in the erection of a new depot and the construction of a new railroad. But actually the plaintiff assumed no risk. That was assumed by the constituent companies which agreed to indemnify plaintiff against loss. The plaintiff could assume no risk for it had no property to assume it with. All the property held in the name of the plaintiff under the terms of the contract belonged to and was owned by the constituent companies. Then too it must not be overlooked that the plaintiff received exemption from the State by the act of 1853 (Laws of 1853, chap. 462). Not for a consideration but as *privilegia favorabilia.* If it paid nothing to the State it is an easy inference that it expected to pay nothing to the city. Besides the plaintiff received in the property it acquired dollar for dollar for every cent it expended.

3. The policing of the streets against the dangers of crossing or passing trains.

Such duty belonged as well to the plaintiff under the general Railroad Act of 1850 and laid within the general and police powers of the city under its charter to regulate the use of its streets. (*Tuttle Bros. & Bruce* v. *City of Cedar Rapids,* 176 Fed. 86; *City of N. Y.* v. *Brooklyn, Q. C. & S. R. R. Co.,* 156 App. Div. 856, 859.)

The purpose of the contract of 1858 was to extend the time of

35

the payment of the mortgage. In 1858 neither the plaintiff nor its stockholders had any rights in River street to surrender. That had been done. (*People* v. *O'Brien,* 111 N. Y. 1.)

The risks of the venture had been assumed and were *fait accompli.* Every dollar of the money borrowed on the credit of the defendant to build a union station and new railway, as before stated, had gone into the coffers of the stockholders. The city received nothing new or otherwise under the reformed or new contract unless it were for the policing of the streets heretofore shown to be a duty primarily resting under the law upon the plaintiff.

The conclusion seems to be inescapable that neither of the agreements contemplated the payment of nor the rendition of service in value equivalent to taxes and that, therefore, the use of the plea of estoppel is superseded because the contract is at war with the public interest. (*N. Y., N. H. & H. R. R. Co.* v. *York & Whitney Co.,* 215 Mass. 36, 40.)

No dollar of the plaintiff's was laid out to accomplish a city purpose.

Estoppel will not lie for another reason. The character of the estoppel invoked is equitable. (2 Pom. Eq. Juris. [4th ed.] § 804.)

The solicitation on the part of the plaintiff for legislative authority for exemption apparent in the language of section XI, and the knowledge that nothing but the taxes or their equivalent would satisfy the demands of the law, sweep away the foundation of the claim of estoppel.

" Where both parties have the same means of ascertaining the truth there can be no estoppel." (*Simplot* v. *Chicago, M. & St. P. R. Co.,* 16 Fed. 350.)

The plaintiff — rather the plaintiff's constituent stockholders — have enjoyed an immunity granted by the State for fifty years. The burden of paying their taxes during all that time has fallen upon the remaining taxpayers of the city. That burden has been borne long enough. To impose it further upon the remaining taxpayers of the city would be unreasonable, unjust and inequitable.

Estoppel, though not favored in its use, constitutes a valuable remedy for the promotion of justice. On the contrary, its use should not be suffered to accomplish a wrong. To make a party whole it is useful; to secure an undue advantage forbidden. (*Wormser* v. *Rubinstein,* 89 Misc. 388; *Pelletreau* v. *Jackson,* 11 Wend. 110, 116; *Pierrepont* v. *Barnard,* 5 Barb. 364, 374; *Pendleton* v. *Richey,* 32 Penn. St. 58, 63; 21 C. J. 1118.)

Judgment for the defendant, with costs.