742 A.2d 141

CITY CHECK CASHING, INC., PLAINTIFF–APPELLANT, v. JUL–AME CONSTRUCTION COMPANY, A/K/A JULE–AME CONSTRUCTION, INC.; MISIR KOCI; NIMBUS ENTERPRISES INC.; MELVIN GREEN, MANUFACTURERS HANOVER TRUST COMPANY; CHEMICAL BANK; CHEMICAL BANK, AS SUCCESSOR IN INTEREST TO MANUFACTURERS HANOVER TRUST COMPANY; DEFENDANTS, AND MANUFACTURERS HANOVER TRUST COMPANY, CHEMICAL BANK, CHEMICAL BANK, AS SUCCESSOR IN INTEREST TO MANUFACTURERS HANOVER TRUST COMPANY, THE CHASE MANHATTAN BANK, AS SUCCESSOR IN INTEREST TO CHEMICAL BANK, DEFENDANT/THIRD–PARTY PLAINTIFFRESPONDENT, v. JUL–AME CONSTRUCTION COMPANY, A/K/A JULE–AME CONSTRUCTION COMPANY, INC.; MISIR KOCI, THIRD–PARTY DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued November 4, 1999—Decided December 14, 1999.

506

508

Before Judges KLEINER, LEVY and LEFELT.

*Gary E. Cohen,* argued the cause for appellant.

*Anthony J. Sylvester,* argued the cause for respondent (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Mr. Sylvester,* of counsel; *Harold L. Kofman,* on the brief).

The opinion of the court was delivered by

LEFELT, J.S.C. (temporarily assigned).

Plaintiff City Check Cashing Service, a New Jersey check cashing business, was asked by a customer to cash a $290,000 check, apparently certified by Manufacturers Hanover Trust Company ("Manufacturers"). Because the date on the check had been altered, plaintiff called Chemical Bank ("Chemical"), the successor to the rights and liabilities of Manufacturers. Chemical requested that plaintiff send a facsimile ("fax") of the check to it. Over two hours later, after not hearing from Chemical, plaintiff cashed the check. Five days later, Chemical returned the check unpaid to plaintiff's bank because the check was counterfeit.

Plaintiff sued the maker and presenter of the check, as well as Chemical, Manufacturers, and Chase Manhattan Bank ("Chase"), as successor in interest to Chemical. Chase moved for summary judgment and plaintiff cross-moved for summary judgment. The

motion judge granted Chase's motion and denied plaintiff's motion after finding Chemical owed plaintiff no duty and the bank had complied with all applicable rules concerning the timely return of the check. Later, plaintiff obtained a default judgment against the check maker because the maker failed to appear for trial.

Plaintiff now appeals the grant of summary judgment to Chase, Chemical and Manufacturers that dismissed its ten count complaint and the denial of its own summary judgment motion. We conclude that the motion judge erred when he found that Chemical owed no duty to plaintiff and, therefore, we reverse and remand for trial on the negligence count. We affirm dismissal of all other counts in plaintiff's complaint.

I.

Plaintiff was a licensed New Jersey check casher operating in Jersey City since 1985. Its manager, Robert Santoro, had the right to determine whether a check should be cashed. Plaintiff's practice was not to ask its customers why they wished to incur a check cashing fee instead of cashing the check in a bank.

In June 1992, Chemical succeeded Manufacturers. Manufacturers' branches took Chemical's name, and beginning in April 1993, the branches used Chemical's certification stamps to certify checks and were not permitted to use Manufacturers' certification stamps. When Manufacturers certified checks, they were given numbers that started with an "I." After Chemical took over, however, the certification numbers began with numbers and not the letter "I."

On July 14, 1994, plaintiff received a $290,000 check drawn by Nimbus Enterprises Inc., and signed by its agent Melvin Green for Nimbus. Nimbus had opened a business checking account at Chemical's 55 West 125th Street branch. The check was drawn on Manufacturers; stamped certified by Manufacturers on July 13, 1994; made payable to Misir Koci, as a representative of Jul–Ame Construction Co.; and was endorsed by Koci.

Santoro and Peggy D'Anna Slansky, an employee of plaintiff, examined the check on July 14, the day after it had purportedly been certified. Santoro believed the check was authentic, properly completed, and not forged. The date on the check appeared to have been changed from August 8, 1994, to July 7, 1994, but Santoro did not believe this invalidated the check. Santoro was aware that Manufacturers had been taken over by Chemical, but did not know that Manufacturers' stamps were no longer being used to certify checks.

Because the check amount was substantial, Slansky called Chemical's customer service line and spoke with Anne MacLellan, a service line representative, and Slansky told MacLellan that she wanted to "verify [the] authenticity of the certification." MacLellan asked questions about the check, including the serial number on the certification stamp, the check amount, and the date of the check. After Slansky gave MacLellan the certified check number, MacLellan told her that Chemical's certification serial numbers did not start with "l." Slansky, however, was not certain whether it was an "I" or a "T" and MacLellan did not tell her that if the certification number began with a letter, the check was invalid.

Slansky told MacLellan that the check was drawn on the New York City West 125 th Street branch. Slansky asked to be connected to that branch, but MacLellan told Slansky to fax the check to her. Slansky faxed the check at 11:20 a.m., and included her name and phone number. The fax said: "We just need to verify with the branch that the date of this check was changed prior to the certification. Please call ... as soon as possible...." Slansky verified that Chemical received the fax. For purposes of this motion, Chase concedes that MacLellan never returned Slansky's telephone call.

Slansky called Green, the maker of the check, and he confirmed that the check date had been changed, before Chemical's certification, to correct a clerical error. Santoro, aware that Koci was in

the construction business, believed that the $290,000 check represented two installments on a construction job.

At 2:00 p.m. on July 14, after no word from Chemical, Santoro, believing the check was authentic, cashed it and paid $290,000, less a one and a half percent fee, to Koci.

Before 3:00 p.m. on July 14, the check was deposited into a New Jersey branch of plaintiff's bank, the Bank of New York. The check was then sent to Chemical for payment through the New York Clearing House. Chemical "captured" the check at 11:31 p.m. on July 14. On Tuesday, July 19, 1994, Chemical returned the check unpaid and marked "counterfeit" to the Bank of New York through the New Jersey Clearing House's 8:00 a.m. exchange. On the same date, the Bank of New York canceled its endorsement on the check.

Chemical dishonored the check because it was certified with an obsolete stamp, the check was drawn on a closed account, and the check did not have the punched holes that Chemical uses when certifying a customer's check. Later, Chemical determined that the check was not listed on the 125th Street branch's certified check log, and the certification signature was not from anyone employed at the bank.

Upon learning of the dishonored check, Santoro contacted Koci. Koci believed that Green used a phony stamp to certify the check. Koci told Santoro that the "people with the money" were in England, but Koci would give $10,000 to Santoro as a show of good faith. Santoro told Koci that if he did not pay, Santoro would have Koci "picked up and brought over here, passport and all ... if you're not here by 12:00 tomorrow." Santoro told Koci, "[d]on't fuck with me because believe me, the $290,000, a lot of things happen, don't fuck with me, pal. You got my money, don't make me come there now." Koci has not been seen since.

Plaintiff filed a ten count complaint against each of the defendants. The first count alleged that plaintiff was a holder in due course and thus entitled to payment on the $290,000 check it had

cashed; the second count alleged that Chemical was negligent in its dealings with plaintiff; the third count alleged violations of *N.J.S.A.* 12A:3–401, 12A:3–404, 12A:3–301, 12A:4–402, and 12A:4–302 of the Uniform Commercial Code ("UCC") as adopted in New Jersey; the fourth count alleged that Chemical must honor the check because it was certified; the fifth count alleged that Chemical committed fraud when it certified the check; the sixth count alleged that Chemical ratified the certification; the seventh count alleged that Chemical's actions amounted to a conversion of plaintiff's funds; the eight count alleged that Chemical should be estopped from denying the check's validity; the ninth count alleged that Chemical breached its duty to act fairly, in good faith and in accordance with reasonable commercial standards; and the tenth count alleged that Chemical remained liable to plaintiff because it waived any rights it had to refuse payment.

In this appeal, plaintiff claims that the motion judge erred when he granted Chemical summary judgment because Chemical was negligent and, therefore, liable to plaintiff; plaintiff was a holder in due course; Chemical failed to return the check by the "midnight deadline"; Chemical committed fraud, waived any defenses and should be estopped from denying responsibility; and Chemical ratified the check.

II.

Both parties agree that New York law controls. *U.C.C.* § 4–102(b) provides that the law of the state where a bank is located governs its liability for action or non-action with respect to a check. Accordingly, because Manufacturers, Chemical and Chase were based in New York, the parties briefed New York law and we shall apply New York law to resolve this matter, though we doubt any difference exists between New York and New Jersey law on the relevant points.

■ Chase claims that due to various legitimate extensions, Chemical's return of the dishonored check on July 19 was timely and, therefore, the judge correctly denied plaintiff's cross-motion

for summary judgment on that issue. We agree with this argument.

*N.Y.U.C.C. Law* § 4–301(1) (McKinney 1999) states:

Where an authorized settlement for a demand item (other than a documentary draft) received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment (subsection (1) of Section 4–213) and before its midnight deadline it

(a) returns the item; or

(b) sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return.

*N.Y.U.C.C. Law* § 4–302 (McKinney 1999) imposes a penalty upon a bank that fails to comply with § 4–301. It states in part:

In the absence of a valid defense such as breach of presentment warrant (subsection (1) of Section 4–207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of

(a) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the items beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline[.]

[*N.Y.U.C.C. Law* § 4–302 (McKinney 1999.)]

*N.Y.U.C.C. Law* § 4–104(h) (McKinney 1999) defines the "midnight deadline" as "midnight on its next banking day following the banking day on which it receives the relevant item or notice from or which the item for taking action commences to run, whichever is later."

However, *N.Y.U.C.C. Law* § 4–103 (McKinney 1999) permits variance of the midnight deadline rule:

(1) The effect of the provisions of this Article may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care ... but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.

(2) Federal Reserve regulations and operating letters, clearing house rules, and the like, have the effect of agreements under subsection (1), whether or not specifically assented to by all parties interested in items handled.

■ Therefore, the midnight deadline can be extended under § 4–103, and Chase argues that Chemical's time limit was extend-

ed because it properly utilized the New Jersey Clearing house rules. Chemical and plaintiff's bank, the Bank of New York, were both members of the New York and New Jersey Clearing Houses.

Yet, plaintiff argues that Chemical missed the midnight deadline because the Bank of New York forwarded the check to Chemical via the New York Clearing House and, therefore, the New York Clearing House rules pertain. Under the New York rules, "[a]ll dishonored checks and other demand items shall be returned no later than 11:00 P.M. on the business day next following the day of receipt." *New York Clearing House Association Constitution,* Article X, Section 1(H)6a. Accordingly, under the New York rules, the check would have been returned late.

Under § 4–103(1), however, a particular clearing house's rules may be applied even to those who have not specifically assented, provided such standards would not be considered "manifestly unreasonable." *N.Y.U.C.C. Law* § 4–103(1) (McKinney 1999).

Nothing appears in either the New York or the New Jersey Clearing House rules to designate which clearing house must be used when each bank is a member of both exchanges. No one is asserting that the New York or New Jersey rules are manifestly unreasonable. Furthermore, no rule states that if an item is sent through one exchange, it must be sent back through the same exchange.

Here, it does not seem unreasonable that Chemical returned the check through the New Jersey Clearing House to the same New Jersey branch bank that initially forwarded the check to Chemical. It is reasonable for a New Jersey branch to use the New York rules to send a check to a New York bank. Likewise, it seems reasonable for a New York bank to return a check to a New Jersey branch by utilizing the New Jersey rules.

There is also no evidence that Chemical intended to delay notification or somehow intentionally or even recklessly impair plaintiff's ability to recover its funds from Koci by using the New Jersey rules. In fact, Santoro admitted that even if he had

learned that the check had not been validly certified between the time the check was cashed and July 19, he would have acted similarly. Santoro still would have contacted Koci. Accordingly, we reject plaintiff's argument that it was unreasonable for Chemical to apply the New Jersey Clearing House rules and we go on to consider whether Chemical complied with those rules.

Rule 9, § 9.1 of the New Jersey Clearing House Association Rules states: "The exchange of unpaid return demand items shall be made no later than at the exchange of the second day of banking business following the day such items were received by the paying bank."

Neither the New Jersey rules nor the UCC define "receive." Chemical's records show that the check was put on the "posting reject journal" and the "kill bundle detail listing" on July 14. The check was then forwarded to Chemical's account reconciliation department for a determination of whether the check should be paid. There is no evidence that Chemical made a provisional settlement of the check. Rather, Chemical merely made internal records of the requested transaction, which led it to determine that the check should be returned unpaid.

In the absence of a different definition of "receive," we conclude that its meaning is equivalent to "presented." Thus, to activate the midnight deadline rule, a demand item must be presented within the meaning of *U.C.C.* § 3–504. *Western Air and Refrigeration, Inc. v. Metro Bank of Dallas,* 599 *F.*2d 83, 88 (5 th Cir.1979). Under *N.Y.U.C.C. Law,* § 3–504(1) (McKinney 1999), "[p]resentment is a demand for acceptance or payment made upon the maker, acceptor, drawee or other payor by or on behalf of the holder."

*N.Y.U.C.C. Law,* § 4–107 (McKinney 1999) states:

(1) For the purpose of allowing time to process items, prove balances and make the necessary entries on its books to determine its position for the day, a bank may fix an afternoon hour of 2 P.M. or later as a cut-off hour for the handling of money and items and the making of entries on its books.

(2) Any item or deposit of money received on any day after a cut-off hour so fixed or after the close of the banking day may be treated as being received at the opening of the next banking day.

Here, none of Chemical's branches were open past 8:00 p.m. on weekdays, including July 14. Thus, because the check was presented for payment after the close of business, the check was not "received" until July 15. *Third Century Recycling, Inc. v. Bank of Baroda,* 704 *F.Supp.* 417, 419–20 (S.D.N.Y.1989); *Pracht v. Oklahoma State Bank,* 592 *P.*2d 976, 978–79 (Ok.1979). Therefore, we must determine whether, under the New Jersey Clearing House rules, Chemical returned the check not later than "the second day of banking business" following July 15.

" 'Banking day' means that part of any day on which a bank is open to the public for carrying on substantially all of its banking functions." *N.Y.U.C.C. Law* § 4–104(c) (McKinney 1999). Comment 1 to *N.Y.U.C.C. Law* § 4–104(1)(c) (McKinney 1999) states, "[u]nder this definition that part of a business day when a bank is open only for limited functions, e.g., on Saturday evenings to receive deposits and cash checks, but with loan, bookkeeping and other departments closed, is not part of a banking day."

In *United Bank of Crete–Steger v. Gainer Bank, N.A.,* 874 *F.*2d 475, 478–80 (7th Cir.1989), the court held that where the bank branch was open to the public only for limited banking functions, where most transactions were not processed until the following Monday, and where the installment and commercial loan departments as well as the bookkeeping department were closed, the bank was not open to the public for substantially all banking business.

Chemical's West 125th Street branch was closed on Saturdays and Sundays in July 1994. Some of Chemical's branches were open to the public for limited hours and with limited operations. The branches did not perform wire transfers nor did they issue foreign drafts or international money orders on the weekend. The branches' return items department, check cashing department and bookkeeping department were all closed on Saturday and Sunday. Any work processed by Chemical's branches after 3:00 p.m. on

Friday was held over to the next business day, which was Monday. Any checks deposited on a Saturday or Sunday were neither processed to the depositor's account nor paid interest until Monday. As permitted under the UCC, all transactions performed after 3:00 p.m. on Friday were not posted until Monday. Therefore, because Chemical was not open to the public for "substantially all" of its banking functions, Saturday and Sunday were properly excluded from the calculation.

Thus, under the New Jersey Clearing House rules, the check was received on Friday, July 15. Saturday and Sunday are excluded. The first business day was July 18 and the second business day was July 19. Therefore, Chemical's return of the check on July 19 was timely under these rules.

■ Plaintiff also contends that Chemical violated the federal rules for the return of checks.

12 *C.F.R.* § 229.30, entitled "Paying bank's responsibility for return of checks," states:

(a) Return of checks. If a paying bank determines not to pay a check, it shall return the check in an expeditious manner as provided in either paragraphs (a)(1) or (a)(2) of this section.

(1) Two-day/four-day test. A paying bank returns a check in an expeditious manner if it sends the returned check in a manner such that the check would normally be received by the depositary bank not later than 4:00 p.m. (local time of the depositary bank) of -

(i) The second business day following the banking day on which the check was presented to the paying bank, if the paying bank is located in the same check processing region as the depositary bank; or

(ii) The fourth business day following the banking day on which the check was presented to the paying bank, if the paying bank is not located in the same check processing region as the depositary bank.

Plaintiff argues that since plaintiff and defendant are in the same check cashing region, the two-day test applies. Thus, plaintiff alleges that Chemical should have returned the check by the second business day following the banking day on which the check was presented to the paying bank.

Plaintiff's analysis, however, has two flaws. First, as discussed above, because Chemical was closed when the Bank of New York

presented the check, the next banking day, July 15, counted as the day of presentment. 12 *C.F.R.* § 229.2(g) defines "business day" as a calendar day other than a Saturday or Sunday. Therefore, the second business day after presentment was July 19, making the return timely.

■ Second, the two-day test applies only when the paying bank is located in the same "check processing region" as the depositary bank. "Check processing region" as defined in 12 *C.F.R.* § 229.2(m) means "the geographical area served by an office of a Federal Reserve Bank for purposes of its check processing activities." Plaintiff claims, by citing to a document showing the member banks of the New York Clearing House, that the Bank of New York and Chemical were in the same processing region. However, in 1994, the Bank of New York (the depositary bank) and Chemical (the paying bank) were served by different offices of the Second Federal Reserve District. 12 *C.F.R.* § 229.30 app. A (1994). Therefore, the four-day test applied, and Chemical's return of the check was timely. Irrespective of whether the two-day or four-day test applied, Chemical complied with the federal rules for check return.

### III.

Plaintiff also claims that the motion judge erred in finding that Chemical did not owe plaintiff a duty and, therefore, no negligence claim could lie. Here, we agree with plaintiff.

■ Preliminarily, plaintiff asserts that the motion judge violated the law of the case doctrine because he reversed his earlier denial of summary judgment on this issue. A trial court, however, may reconsider and modify all interlocutory orders at any time prior to the entry of final judgment. *C.P. v. Township of Piscataway Bd. of Educ.*, 293 *N.J.Super.* 421, 431, 681 A.2d 105 (App.Div.1996). Therefore, the motion judge's exercise of discretion in reconsidering his previous denial is not objectionable under the law of the case doctrine.

In explaining his reconsidered ruling on the negligence count, the judge stated:

> The Court agrees with the position of the bank that it had no duty to the non-customer City Check Cashing and it did not assume any duty by virtue of the phone call. It's clear that the bank never advised City Check Cashing to cash that check or advised City Check Cashing that the check was good or valid. City Check Cashing took it upon itself basically to cash this check for its customer that it had dealt with before ... The Court believes therefore since there was no duty on the part of the bank, the bank did not assume any duty, did not give City Check Cashing any reason to believe that the check was valid ... the bank is entitled to summary judgment[.]

A drawee bank "may be liable apart from the instrument based upon a contract or tort theory of recovery." *Schering–Plough Healthcare Products, Inc. v. NBD Bank, N.A.*, 890 *F.Supp.* 651, 655 (E.D.Mich.1995), *aff'd*, 98 *F*.3d 904 (6th Cir.1996). A requisite for negligence liability, however, is the existence of a duty owing from defendant to plaintiff. *Pennsylvania Nat'l Turf Club v. Bank of W. Jersey*, 158 *N.J.Super.* 196, 203, 385 *A*.2d 932 (App. Div.), *certif. denied*, 77 *N.J.* 506, 391 *A*.2d 520 (1978); *accord Eiseman v. State*, 70 *N.Y.*2d 175, 518 *N.Y.S.*2d 608, 511 *N.E.*2d 1128, 1134 (1987). Whether a duty exists is a legal issue to be determined by the court. *Megally v. LaPorta*, 253 *A.D.*2d 35, 679 *N.Y.S.*2d 649, 653 (1998).

To make this decision, a court will look to whether the relationship between the parties, in fairness, should give rise to a duty of care. *Di Ponzio v. Riordan*, 89 *N.Y.*2d 578, 657 *N.Y.S.*2d 377, 679 *N.E.*2d 616, 618 (1997). "The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." *Goldberg v. Housing Auth. of Newark*, 38 *N.J.* 578, 583, 186 *A*.2d 291 (1962).

It has been held that a "transient and noncontractual" relationship is not enough to establish a duty. *FMC Corp. v. Fleet Bank*, 226 *A.D.*2d 225, 641 *N.Y.S.*2d 25, 26 (1996). In another context, it was determined that a manufacturer owed no duty to a plumber who called an "800" number for information on the best product to use for a particular job. *Par Plumbing Co., Inc. v. Engelhard Corp.*, 256 *A.D.*2d 124, 681 *N.Y.S.*2d 280, 281 (1998). Neverthe-

less, "a duty to speak with care exists when the relationship of the parties, arising out of contract or otherwise, is such that in morals and good conscience one has the right to rely upon the other for information." *Id.* at 280.

In the absence of any agreement, undertaking or contact, a bank owes no general duty, other than those set forth in the UCC, to a non-customer who undertakes to cash its depositor's checks. *Pennsylvania Nat'l Turf Club, supra,* 158 *N.J.Super.* at 203, 385 *A.*2d 932; *Gesell v. First Nat'l City Bank of New York,* 24 *A.D.*2d 424, 260 *N.Y.S.*2d 581, 581–82 (1965); *Berkoff v. Klein,* 81 *N.Y.S.*2d 244, 245–46 (Sup.Ct.1948); *Portage Aluminum Co. v. Kentwood Nat'l Bank,* 106 *Mich.App.* 290, 307 *N.W.*2d 761 (1981).

If a bank undertakes to speak, however, it has an obligation to "speak carefully." *Anchor Lumber Corp. v. Manufacturers' Trust Co.,* 242 *A.D.* 656, 272 *N.Y.S.* 610, 611 (1934). As Judge Learned Hand said: "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Glanzer v. Shepard,* 233 *N.Y.* 236, 135 *N.E.* 275, 276 (1922). Also, when there is an undertaking or contact, a duty may be imposed "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n,* 731 *F.*2d 112, 123 (2d Cir.1984). Besides possessing superior knowledge, a duty to disclose may also arise where good faith and common decency require disclosure. *Fischer v. Kletz,* 266 *F.Supp.* 180, 188 (S.D.N.Y.1967).

In the present case, though plaintiff was a non-customer who made one phone call to Chemical to verify the check, we find that when Chemical asked plaintiff to fax the check, Chemical undertook a duty to respond within a reasonable time.

It is important to note that MacLellen specifically told Slansky to fax the certified check for Chemical's review and requested plaintiff's phone number. MacLellen said: "Okay, fax it to

(516)933–7182, fax it to A. MacLeelan, Attention Unit Four and make sure you put your name and a number where you can be reached.... Right, and make sure you put your name and your telephone number where you can be reached." By this action, Chemical implied that it would answer plaintiff's question. Chemical argues, however, that the tenor of the question was only to verify the check date and not whether the check was valid.

It is true that Slansky began the conversation by telling Mac-Lellan that she had a certified check and needed "to verify the authenticity of the certification." Despite beginning in that fashion, Slansky then stated, "the reason I'm calling is I have a problem with the date, it looks like the date on the check has been altered and the ... payee claims that the date was changed prior to the certification and I need to make sure that that is true." We agree that the entire conversation could be understood to limit plaintiff's inquiry to the date alteration. In fact, Slansky's fax contained this note: "We just need to verify with the branch that the date of this check was changed prior to the certification." Accordingly, Chemical argues that even if it assumed a responsibility to answer that limited question, it undertook no obligation to respond generally.

Nevertheless, once Chemical received the fax, its representative knew, or should have known, that the check was drawn on a closed account, certified by a bank no longer in business, contained a numbering code not used by Chemical, and did not have the customary punched holes that Chemical used to certify checks. Once Chemical received the fax, all the information indicating that this very large check might be invalid was immediately evident.

In addition, Chemical knew that plaintiff intended to cash the check and, thus, injury was foreseeable. Furthermore, Chemical denied plaintiff's request to contact the 125th Street branch directly. It was immeasurably easier for Chemical to contact the branch. Chemical later determined that the check was not listed on the branch's certification log and that the certifier's signature was someone unknown to the branch. Thus, this information was

easy to determine and further indicated that the check was most certainly problematic.

Chemical argues, however, that drawee banks should have no obligation to do anything with a check until after presentment. Chemical asserts that public policy should not impose any duty on banks to advise payees or potential check holders about the validity of a check before presentment. We agree generally with this position as it relates to ordinary checks. Yet, in this case and under these unique circumstances, Chemical was aware that plaintiff held a large check, purportedly certified, and Chemical asked plaintiff to fax the check for its review. Moreover, assuming plaintiff's inquiry was solely a question of whether the date was changed before certification, that question, in our opinion, could not be accurately answered without addressing the validity of the certification.

In addition, we find the type of instrument at issue most significant. Certified checks are commonly used in the business and commerce of this country. Most persons consider a certified check to be virtually equivalent to cash. *Edwards v. National City Bank of New York,* 150 *Misc.* 80, 269 *N.Y.S.* 637, 639 (N.Y.Mun.Ct.1934). Certifying a check signifies to the world that the certifying bank has cash on hand to cover that check. "The integrity of the certified check is a valuable asset in our economy." *Jefferies & Co. Inc. v. Arkus–Duntov,* 357 *F.Supp.* 1206, 1217 (S.D.N.Y.1973).

The practice of certifying checks has grown out of the business needs of the country. They enable the holder to keep or convey the amount specified with safety. They enable persons not well acquainted to deal promptly with each other, and they avoid the delay and risks of receiving, counting and passing from hand to hand large sums of money.

[*Merchants' Nat'l Bank v. State Nat'l Bank,* 10 *Wall* 604, 77 *U.S.* 604, 648, 19 *L.Ed.* 1008, 1019 (1870).]

Accordingly, because the check was purportedly certified, once Chemical requested the fax, under the circumstances of this case, Chemical assumed an obligation to respond, within a reasonable time, regarding any certification problems it perceived, at

least on the face of the check. Based upon the motion facts, because Chemical did not respond before plaintiff cashed the check, a factual dispute existed concerning whether the lack of response constituted negligence.

Plaintiff next argues that Chemical had a duty to "innocent third parties who are injured as a result of the failure of Chemical to secure or destroy their certified stamps." To support this claim, plaintiff cites *N.Y.U.C.C. Law* § 3-406 (McKinney 1999), which states:

Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

Plaintiff also cites the following cases claiming that they follow § 3-406 and support its position that Chemical was liable because it negligently secured the certification stamps: *Dubin v. Hudson County Probation Dep't*, 267 *N.J.Super.* 202, 630 *A.*2d 1207 (Law Div.1993); *Adamar of New Jersey, Inc. v. Chase Lincoln First Bank, N.A.*, 201 *A.D.*2d 174, 615 *N.Y.S.*2d 550 (1994); *Michaeli v. Greater New York Sav. Bank*, 129 *Misc.*2d 1096, 498 *N.Y.S.*2d 90 (App.Term.1985); *Savemart Inc. v. Bowery Sav. Bank*, 117 *Misc.*2d 947, 461 *N.Y.S.*2d 144 (App.Term.1982).

Although the cited cases do preclude a bank from denying payment on forged or stolen instruments where the bank contributed to the problem, none of the cases provide an affirmative cause of action. To the contrary, comment 5 to *N.Y.U.C.C. Law* § 3-406 (McKinney 1999) states, "[t]his section does not make the negligent party liable in tort for damages resulting from the alteration. Instead it estops him from asserting it against the holder in due course or drawee." Plaintiff never became a holder in due course as against Chemical because Chemical never accepted the check. While a certified check is an acceptance, *N.Y.U.C.C. Law* § 3-411(1) (McKinney 1999) was not intended to apply to fraudulent certifications. *Ralston Bank v. Kansas Bankers Sure-*

*ty Co.*, 794 *F.Supp.* 896, 898 (D.Neb.1992); *N.Y.U.C.C. Law*, § 3–307(1)(a) (McKinney 1999). Acceptance requires a writing by the drawee. *U.C.C.* § 3–409(a). Thus, even if Chemical were negligent in securing its stamp, such negligence would not provide an affirmative cause of action.

Chase also argues that the alleged negligent acts of Chemical were not the proximate cause of plaintiff's injury. Rather, Chase asserts that when plaintiff cashed the check without hearing from Chemical, plaintiff's negligence superseded any negligence by Chemical. Generally, proximate cause questions present issues of fact for a jury's determination. *Megally, supra,* 679 *N.Y.S.*2d at 655. Santoro explained cashing the check as follows:

> After not receiving any return telephone call from Chemical; the check being certified and appearing valid and authentic without any claim against it; and City having all the necessary documents required by bank regulations; the check was cashed. This was routine. If I thought that the check or certification were bad I would not have allowed the check to be cashed.

At that time, Santoro knew that Chemical had taken over Manufacturers, but he did not know that Manufacturers' certification stamps were no longer in use. Santoro also knew that there might be a problem with the identification number on the check and that plaintiff had had a previous problem with Koci and Green. In early July 1994, Koci attempted to cash a $145,000 check from Nimbus. Slansky had called Chemical to see if there were sufficient funds to cover the check, and the automated information line stated that the check was not good. Slansky then phoned Green, who told her that there was enough money in the account and that she could verify this by calling another number. Slansky called, but it was a wrong number. Slansky then told Koci to have the check certified by the bank.

This previous experience with Koci and Green, together with the knowledge of Manufacturers non-existence and possible erroneous identification number, should have created some reasonable suspicion regarding the check's validity. Cashing the check despite this suspicion raises a question of negligence. A jury could decide that plaintiff was negligent in precipitously cashing

this check. Yet, given that the check was purportedly certified, we do not find, as a matter of law, that plaintiff's action, even if negligent, was superseding. *Massena Towne Center Associates v. Sear–Brown Group, Inc.,* 255 *A.D.*2d 893, 680 *N.Y.S.*2d 349 (1998). Thus, based on these facts, we conclude that a reasonable jury need not determine that plaintiff's negligence was the sole cause of its loss. A jury could view Chemical's failure to respond within a reasonable time as negligence which contributed to plaintiff's loss. Further, a jury could determine that Chemical's failure to respond was a proximate cause leading to plaintiff's loss. Therefore, Chemical's conduct would be compared with any negligence ascribed to plaintiff for prematurely cashing the check. *N.J.S.A.* 2A:15–5.1 to –5.8; *N.Y.C.P.L.R.* § 1411 (McKinney 1999).

IV.

In his decision dismissing plaintiff's ten count complaint, the motion judge only explained his reasons for dismissing the second count and why, in his opinion, Chemical complied with the midnight deadline. While we disagree with the judge's resolution of count two, we agree with his determination that plaintiff was not entitled to recover for Chemical's alleged failure to comply with the midnight deadline rules.

As we have also explained, the plaintiff never became a holder in due course as against Chemical because Chemical never accepted the check. Additionally, there was no evidence that the certification was legitimate. The only evidence presented indicated that the certification was fraudulent. Therefore, the motion judge properly dismissed plaintiff's first count alleging its entitlement to payment of the check as a holder in due course and the fourth count alleging plaintiff's entitlement to payment because the check was validly certified by Chemical.

After reviewing the record, we also cannot find any evidence that Chemical violated the UCC or converted plaintiff's funds. Therefore, we affirm dismissal of the third and seventh counts of plaintiff's complaint.

Ratification can occur only where a party having actual knowledge of the forgery takes some action demonstrating that it intended to affirm the forgery. *Northgate Elec. Profit Sharing Plan v. Hayes*, 210 *A.D.*2d 384, 620 *N.Y.S.*2d 418, 419 (1994), *leave to appeal denied*, 87 *N.Y.*2d 811, 644 *N.Y.S.*2d 144, 666 *N.E.*2d 1058 (1996). There is no evidence of any ratification by Chemical. Accordingly, the sixth count was properly dismissed.

Furthermore, the record contains no evidence indicating that MacLellan actually knew the check was counterfeit or that Chase or any bank participated in the fraudulent certification. Only conclusory and unsubstantiated allegations of fraud were made by plaintiff. Accordingly, the motion judge properly dismissed the fifth count charging fraud.

Plaintiff supplied insufficient evidence of Chemical's words or conduct to support a claim of waiver or estoppel against Chemical. *Geiler v. Littlefield*, 148 *N.Y.* 603, 43 *N.E.* 66, 68 (1896); *Troy Union R.R. Co. v. City of Troy*, 132 *Misc.* 534, 230 *N.Y.S.* 653, 664 (Sup.Ct.1927), *aff'd*, 227 *A.D.* 351, 238 *N.Y.S.* 577 (1929), *aff'd*, 253 *N.Y.* 597, 171 *N.E.* 798 (1930). Moreover, there was no evidence that Chemical breached any commercial standards or any obligation to act in good faith. "A party cannot defeat a motion for summary judgment merely by submitting an expert's report in his or her favor." *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 544, 666 *A.*2d 146 (1995). The eight, ninth and tenth counts of the complaint were, therefore, properly dismissed.

For the reasons stated in Part III, we conclude that the motion judge erred in granting summary judgment to Chase, Chemical, and Manufacturers on the negligence claim contained in count two. We find that a factual dispute exists as to whether Chemical's failure to respond within a reasonable time is both negligent and a proximate cause of plaintiff's loss. At trial, if Chase presents testimony indicating that Chemical did respond, then the question shall be whether Chemical's response, if any, was negligent and, if so, whether the negligent response was a proximate cause of plaintiff's loss.

Accordingly, we affirm the motion judge's dismissal of counts one, three, four, five, six, seven, eight, nine and ten. We reverse the dismissal of count two alleging negligence and remand for further proceedings in accordance with this decision.