764 A.2d 411

CITY CHECK CASHING, INC., PLAINTIFF–RESPONDENT, v. MANUFACTURERS HANOVER TRUST COMPANY; CHEMICAL BANK; CHEMICAL BANK, AS SUCCESSOR IN INTEREST TO MANUFACTURERS HANOVER TRUST COMPANY, DEFENDANTS, AND THE CHASE MANHATTAN BANK, AS SUCCESSOR IN INTEREST TO CHEMICAL BANK, DEFENDANT AND THIRD PARTY PLAINTIFF-APPELLANT, v. JUL–AME CONSTRUCTION COMPANY, A/K/A JUL–AME CONSTRUCTION, INC. AND MISIR KOCI, DEFENDANTS AND THIRD PARTY–DEFENDANTS, AND NIMBUS ENTERPRISES, INC. AND MELVIN GREEN, JOINTLY, SEVERALLY, OR IN THE ALTERNATIVE, DEFENDANTS.

Argued October 10, 2000—Decided January 17, 2001.

*Anthony J. Sylvester*, argued the cause for appellant (*Riker, Danzig, Scherer, Hyland & Perretti*, attorneys; *Harold L. Kofman*, on the briefs).

*Gary E. Cohen*, argued the cause for respondent.

*Dennis R. Casale*, argued the cause for amicus curiae, New Jersey Bankers Association (*Jamieson, Moore, Peskin & Spicer*, attorneys).

The opinion of the court was delivered by

LONG, J.

This case requires us to plumb the relationship between the Uniform Commercial Code (Code or U.C.C.) and the law of negligence in connection with the return of a check by a drawee bank within the time allowed by the Code. The question presented is whether the drawee bank's dealings with a non-customer in an unsolicited telephone conversation breached a common law duty, rendering it potentially liable for the loss.

## I

The facts of the case are largely undisputed. In 1994, plaintiff, City Check Cashing, Inc., was a check cashing service located in Jersey City that had been in operation for almost ten years. Robert Santoro was the manager. The clerk was Peggyann Slansky (also referred to as Peggy D'Anna).

On July 1, 1994, Misir Koci, an agent of Jul–Ame Construction, presented Santoro with a $145,000 check signed by Melvin Green, an agent of the Nimbus Corporation, drawn on defendant Manufacturers Hanover Trust Company ("Manufacturers") for cashing. Slansky called Chemical Bank,[1] the successor to Manufacturers, and was informed by computer that the check was not good. Santoro advised Koci that he could not cash the check unless it was certified. Slansky also contacted Green, who asked her to call his bank branch for verification. The number he gave her was wrong. Green also told Slansky that the check would be good despite the Bank's statement to the contrary. Check Cashing refused to cash the $145,000 check.

---

[1] Defendant Chase Manhattan has since succeeded Chemical.

Two weeks later, on July 14, 1994, Koci sought to cash another check of Nimbus Enterprises, Inc., also signed by Melvin Green and drawn on Manufacturers. That check, in the amount of $290,000, was stamped with a Manufacturers certification stamp, although, as has been noted, that institution had previously been merged into Chemical Bank. The date on the check had clearly been changed from August 8, 1994 to July 7, 1994.

Santoro asked Slansky to call Chemical Bank and verify the authenticity of the check. Around 11:00 a.m., on July 14, Slansky called Chemical and spoke to Anne McClellan. The following is a transcript of the full conversation between Slansky and McClellan:

S: Hi, I'm calling from City Check Cashing and I have a customer here with a certified check and I need to verify it's authenticity of the certification.

M: What is the serial number?

S: The serial number on the certified thing? It says number on top of the stamp, that number?

M: Yes.

S: I as in ice cream, 2936898, it was certified yesterday

[omitting interruption by a Check Cashing employee].

M: Is that the number off the top right hand S: The top of the certification, that's the serial number on it. It looks like it was certified at the 125th Street office in New York City, West 125th Street.

M: Because normally it doesn't start with an I, that's the only reason I'm asking.

S: I wonder what it is, it looks like an I to me, it's signed by Walter or somebody with a W, Walter, you know, what I'm talking about, the certified stamp?

M: Right.

S: Is it possible that I can get through to that branch, maybe they can help me?

M: How much is the check for?

S: $290,000.

M: $290,000?

S: Yes, okay, I'll—

M: Let me just read it back, is that a definite I?

S: Definite unless it's a T or something.

M: 29368898.

S: Uh-huh.

M: And you said it was certified yesterday?

S: Yes, at the 125th Street branch and it looks like the signature on it, like it begins with a W, Walter of something like that. I have—the reason I'm calling is I have a problem with the date, it looks like the date on the check has been altered

and the customer claims—the payee claims that the date was changed prior to the certification and I need to make sure that that is true, you know?

M: Okay, hold on.

S: I may have to fax this check to the branch themselves and let them make sure that it was changed prior.

M: All right, hold on for a second. Is there any way you can fax that to us?

S: Sure, that's what I want to do, I want to fax this to you to make sure it was altered prior to the certification.

M: Okay, fax it to (516) 933-7182, fax it to A: McClellan, Attention Unit Four and make sure you put your name and a number where you can be reached.

S: So (516) 933-7182, attention A. McClellan, Unit Four?

M: Right, and make sure you put your name and your telephone number where you can be reached.

S: Okay, thank you very much.

M: You're welcome.

S: Bye.

M: Bye.

Pursuant to that conversation, Slansky sent McClellan a facsimile on July 14, 1994, at 11:20 a.m. The bottom of the facsimile stated, in bold, underlined, and capitalized print: "Message, We just need to verify with the branch that the date on this check was changed prior to the certification. Please call Peggy D'Anna (201)435-7198 as soon as possible." According to McClellan, because she did not understand the nature of Slansky's question regarding the date on the check, she requested the facsimile. It is unclear from the record at what point the fax was actually received by McClellan. She stated that she received it on the "afternoon" of July 14. McClellan also claimed (and it was disputed) that she called Slansky back on the afternoon of July 14, 1994, and told her that she was unable to answer the question regarding the date. Other than the original conversation, the facsimile, and the disputed second conversation, there was no further contact between Check Cashing and Chemical until July 19, 1994.

In addition to calling Chemical, Slansky also called Green. He stated that the date on the check was altered before it was certified. Slansky attempted to contact the bank manager who, Green told her, would verify the check. Again, the phone number he gave her was wrong.

Neither Santoro nor Slansky called Chemical back to inquire about the check. Check Cashing cashed it at about 2:00 p.m. on July 14, 1994. Koci was given the cash amount of the check, minus the 1.5% fee ($4,500) that Check Cashing charged. The check was deposited in Check Cashing's bank, The Bank of New York, within an hour.

Later on July 14, 1994, the check was routed to Chemical through the New York Clearing House Exchange. Chemical immediately captured the information on the check and ran it through its computers at 11:31 p.m. After that preliminary procedure, the check was again run through the computers for a process called "posting," whereby the Bank makes a determination on whether a check is payable. The posting occurred during the early hours of Friday, July 15, 1994. Chemical's computers found the check to be invalid because the account number did not exist. In addition, the check was certified with an old, unused stamp, and did not have the punched holes that Chemical uses when it certifies a check.

On Tuesday, July 19, 1994, the check was returned unpaid to the Bank of New York through the New Jersey Clearing House's 8:00 a.m. exchange. The Rules of the New Jersey Clearing House Association provide that the return of unpaid demand items shall take place no later than the second banking business day following the receipt of such items. *New Jersey Clearing House Association Rules*, Article 9, § 9.1 (effective August 1987). Because the check arrived at the Bank of New York after 2:00 p.m. on the 14th, it was deemed received on the 15th. Saturday and Sunday were not banking business days. Thus, the Tuesday return was timely under the New Jersey Clearing House Rules and the U.C.C. On the 19th, The Bank of New York canceled its endorsement. Check Cashing also learned of the problem on that date. Santoro called Koci who advised him that he would make good on the check. Koci also told Santoro that the money was gone, taken by someone to England. Despite threats by Santoro and promises by Koci, Koci disappeared shortly after the conversation.

The Federal Bureau of Investigations investigated Koci's disappearance but could not locate him.

Santoro, who had never heard the tape of the conversation between Slansky and McClellan, stated, in discovery, that if he had been aware that Chemical had told Slansky that the certification number on the check "did not sound like one belonging to the bank," he would not have cashed the check because he would have known something was wrong.

In May of 1995, Check Cashing filed a ten count complaint against Manufacturers and its successors, Nimbus Enterprises Inc., Melvin Green and Jul–Ame Construction Company. *City Check Cashing, Inc. v. Jul–Ame Constr. Co.*, 326 *N.J.Super.* 505, 512, 742 *A.2d* 141 (App.Div.1999), *certif. granted*, 163 *N.J.* 396, 749 *A.2d* 370 (2000). Among the counts were allegations that Chemical was negligent in dealing with the check and also violated a number of Uniform Commercial Code provisions in its handling. *Id.* at 512–13, 742 *A.2d* 141. The trial court granted summary judgment in favor of Chemical.[2] Check Cashing later obtained a default judgment against the maker of the check. Check Cashing appealed the summary judgment and a panel of the Appellate Division agreed that summary judgment was proper on all counts, except for negligence, and reversed and remanded that count for trial. *Id.* at 527–28, 742 *A.2d* 141. The Appellate Division found that when Chemical asked for a facsimile of the check, it undertook a duty to respond within a reasonable time and that it was for a jury to assess whether its actions were negligent. *Id.* at 521, 742 *A.2d* 141. Additionally, the court explained that in cases dealing with certified checks, there is a need for extra protection. *Id.* at 523–24, 742 *A.2d* 141. The court concluded that Check Cashing's actions may also have been negligent, sufficient to

---

[2] In so doing, the court properly accepted only the evidence favorable to the plaintiff. *R.*4:46–2(c). Thus, McClellan's contested claim to have returned Slansky's call was not considered. Nor do we consider it here.

supercede Chemical's negligence. *Id.* at 525, 742 *A.*2d 141. Both issues were left to the jury. *Id.* at 526, 742 *A.*2d 141.

We granted Chemical's petition for certification on the negligence claim and denied Check Cashing's cross-petition for certification on the U.C.C. claims. *City Check Cashing v. Manufacturers Hanover Trust Co.*, 163 *N.J.* 396, 749 *A.*2d 370 (2000).

## II

The question presented is whether, under the circumstances outlined above, the bank breached a common-law duty to plaintiff, a non-customer, thereby permitting a claim of negligence to lie. It arises in the context of the modern check collection and payment system, the subject of detailed statutory regulation.

The Uniform Commercial Code, augmented by federal regulation, provides a comprehensive framework for allocating and apportioning the risks of handling checks. The Legislatures of New Jersey and New York, like those of other states, have made policy choices in allocating liability in the collection of checks. In this case, the pertinent policy choices made by the Legislatures enacting the Code are reflected in the New York and New Jersey counterparts to Uniform Commercial Code sections 4–301 and 4–302. *N.J.S.A.* 12A:4–301, –302; *N.Y.U.C.C.* Law §§ 4–301,—302 (McKinney 2000).

Both parties agree that New York law controls. Indeed, there is no difference between the provisions of the New York and New Jersey statutes regarding the issue before us. For completeness, however, we cite the relevant provisions of the Code from both states.

The Uniform Commercial Code provisions operate in the following manner. Upon "presentment" of a check, a bank must either pay or dishonor it by a midnight deadline. *N.J.S.A.* 12A:4–301(a); *N.Y.U.C.C.* Law § 4–301(1)(McKinney 2000). "Presentment" is a formal demand to pay the instrument. *N.J.S.A.* 12A:3–501(a); *N.Y.U.C.C.* Law § 3–504(1) (McKinney 2000). The deadline is

midnight on the next banking day following the day on which the bank receives the relevant item, or from which the time for taking action commences to run, whichever is later. *N.J.S.A.* 12A:4–104(a)(10); *N.Y.U.C.C.* Law § 4–104(1)(h)(McKinney 2000). In the normal course, presentment of a check triggers a bank's electronic processing systems. Under the Code, the bank must decide by the midnight deadline, usually electronically, whether to pay or dishonor a check, and commercial certainty is provided to banks, customers, and non-customers in the process.

The Code permits the variance of the midnight deadline by agreement of the parties. *N.J.S.A.* 12A:4–103; *N.Y.U.C.C.* Law § 4–103(McKinney 2000). In addition, Clearing House Rules and Federal Reserve regulations may vary the midnight deadline as was the case here. *N.J.S.A.* 12A:4–103; *N.Y.U.C.C.* Law § 4–103(McKinney 2000). Where a payor bank fails to act within its midnight deadline, the penalty imposed by section 4–302 applies and the bank is accountable for the face amount of the check. *N.J.S.A.* 12A:4–302; *N.Y.U.C.C.* Law § 4–302 (McKinney 2000); *Penn. Nat'l Turf Club v. Bank of W. Jersey,* 158 *N.J.Super.* 196, 202, 385 *A.*2d 932 (App.Div.), *certif. denied,* 77 *N.J.* 506, 391 *A.*2d 520 (1978); *Hanna v. First Nat'l Bank of Rochester,* 87 *N.Y.*2d 107, 637 *N.Y.S.*2d 953, 661 *N.E.*2d 683, 687 (1995); *General Motors Acceptance Corp. v. Bank of Richmondville,* 203 *A.D.*2d 851, 611 *N.Y.S.*2d 338, 339 (1994).

It is against that backdrop, and mindful of the balance of interests reflected in the Legislatures' enactment of the Code's provisions, that most courts have been reluctant to sanction common law negligence claims. "Only in very rare instances should a court upset the legislative scheme of loss allocation and permit a common law cause of action." *Bank Polska Kasa Opieki v. Pamrapo Savings Bank,* 909 *F.Supp.* 948, 956 (D.N.J.1995); *see also Girard Bank v. Mount Holly State Bank,* 474 *F.Supp.* 1225, 1239 (D.N.J.1979)(noting that "[c]ourts should be hesitant to improvise new remedies outside the already intricate scheme of Articles 3 and 4."). It is fair to say, however, that implicit in those

expressions of the need for restraint is a recognition that a common law duty, in fact, may arise and that its breach may be actionable in spite of the existence of the Uniform Commercial Code. *Girard Bank, supra,* 474 *F.Supp.* at 1239; *see also Penn. Nat'l Turf Club, supra,* 158 *N.J.Super.* at 203, 385 *A.2d* 932 (stating that "although a bank has complied with Uniform Commercial Code provisions, such compliance does not necessarily immunize it from ordinary tort liability.").

The question of whether a duty exists is a matter of law to be decided by the court. *Woods Corporate Assocs. v. Signet Star Holdings, Inc.,* 910 *F.Supp.* 1019, 1033 (D.N.J.1995); *Strachan v. John F. Kennedy Mem'l Hosp.,* 109 *N.J.* 523, 529, 538 *A.2d* 346 (1988). It is an inquiry that ultimately involves " 'a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.' " *Kelly v. Gwinnell,* 96 *N.J.* 538, 544, 476 *A.2d* 1219 (1984)(quoting *Goldberg v. Housing Auth. of Newark,* 38 *N.J.* 578, 583, 186 *A.2d* 291 (1962)). In actions based on nonfeasance, as is the case here, "it is necessary to find some definite relation between the parties, of such a character that social policy justifies the imposition of a duty to act." W. Page Keeton et. al., *Prosser & Keeton on Torts* § 56 at 374 (5th ed.1984). Moreover, a duty to disclose may arise where good faith and common decency require it. *Fischer v. Kletz,* 266 *F.Supp.* 180, 188 (S.D.N.Y.1967).

### III

How a duty can arise in the banking context, outside of the scheme provided by the U.C.C., is a subject that has received attention from a number of courts. In general, courts have recognized tort liability of a financial institution where a special relationship has been established from which a duty can be deemed to flow. *See Cumis Ins. Soc'y, Inc. v. Windsor Bank & Trust Co.,* 736 *F.Supp.* 1226, 1233 (D.Conn.1990) (noting that banks have a duty to disclose where some special relationship has been established such as fiduciary, confidential, contractual or

legal or where there was fraud or misrepresentation on part of defendant bank).

■ Absent a special relationship, courts will typically bar claims of non-customers against banks. The New York Supreme Court, Appellate Division, for example, has held that a "transient and noncontractual relationship" is not enough to establish a duty. *FMC Corp. v. Fleet Bank,* 226 *A.D.*2d 225, 641 *N.Y.S.*2d 25, 26 (1996). That court dismissed a negligent misrepresentation claim asserted against a bank by a creditor of the bank's customer. *Ibid.* The bank inaccurately had responded to a creditor's inquiry about the creditworthiness of the bank's customer by stating that the bank's relationship with its customer was satisfactory. *Id.* at 28. The court described the creditor's inquiry as a "transient and non-contractual" relationship that did not create a duty on the part of the bank to respond fully and accurately to the creditor. *Id.* at 29.

In *Pereira v. United Jersey Bank,* 201 *B.R.* 644, 671 (S.D.N.Y. 1996), the United States District Court for the Southern District of New York adopted the rationale of *Penn. Nat'l Turf Club,* supra, 158 *N.J.Super.* at 203, 385 *A.*2d 932, when it dismissed a negligence action brought under New Jersey law by noncustomers. The court held that defendant banks owed no duty of care to those non-customers in a check-kiting scheme even though the bank's alleged negligence foreseeably resulted in injury to them. *Pereira, supra,* 201 *B.R.* at 671. In reaching its conclusion, the court opined:

> New Jersey's common law of negligence does not impose a duty of care on the Banks upon which the Customers may hinge their negligence claims. The allegations in the Customers' complaints do not support the existence of any agreement, undertaking or contract[3] between the Customers and the Banks which would give rise to a special duty on behalf of the Banks to take measures to protect the Customers from Payroll's wrongdoing.
>
> [*Id.* at 671.]

---

[3] A review of *Pereira* reveals that the use of the word "contract" resulted from a typographical error. *Pereira* cites *Penn. Nat'l Turf Club* correctly at page 670 for the proposition that "an agreement, undertaking or contact could give rise to a duty." *Pereira, supra,* 201 B.R. at 670.

In *Penn. Nat'l Turf Club, supra,* 158 *N.J.Super.* at 201, 385 A.2d 932, the bank was sued in negligence for permitting a depositor, Zeek, to overdraw his account by substantial margins resulting in financial damage to the plaintiff. The trial court reasoned that "the bank's pattern of conduct in handling the Zeek account throughout its existence constituted a negligent failure to exercise reasonable care which, in turn, permitted Zeek to carry out his scheme to the damage of the Turf Club." *Ibid.* The Appellate Division rejected that negligence theory, instead holding that regardless of the manner in which the bank handled the Zeek account it owed no duty to the plaintiff giving rise to an action in negligence. *Ibid.* The panel stated:

[A] fundamental requisite for tort liability is the existence of a duty owing from defendant to plaintiff. [citations omitted]. In the context of the record facts herein, the bank owed no general duty to Turf Club merely by way of warning or other notice, merely because the latter undertook to cash its depositor's checks, which turned out to be dishonored for insufficient funds. Beyond the duty relating to return of the instruments, the drawee bank herein had no duty arising out of a relationship to the holder of the checks which could ripen into tort liability. *In the absence of evidence of any agreement, undertaking or contact between plaintiff and defendant from which any special duty can be derived, the improper handing of the Zeek account cannot in the abstract serve as a stepping stone for liability to plaintiff.*

[*Id.* at 203, 385 *A.*2d 932 (emphasis added).]

Indeed, the notion that under New York and New Jersey law a "special relationship" must exist for a duty to arise conforms with the law in other jurisdictions. In *Portage v. Kentwood National Bank,* 106 *Mich.App.* 290, 307 *N.W.*2d 761, 762–63 (1981), a claim was asserted against a bank by the customers of a payroll service that maintained an account at the bank when it closed the account and returned the checks unpaid to the payroll service's customers. The trial court found that the bank was liable to customers of the bank's depositor for damages based on breach of fiduciary duty and negligence. *Id.* at 763. The Court of Appeals reversed and stated:

We adopt both the holding and rationale as set forth by the *Turf* Court. Therefore, we conclude that the ·trial court erred and that the bank cannot be held liable

to the plaintiffs under a legal theory of negligence. We find the record barren of any unique relationship by which we can factually distinguish the instant case from other commercial transactions regulated by traditional banking laws and the Uniform Commercial Code. Again, we reiterate that to hold defendant liable under these facts is too radical a departure from well-established law.

[*Id.* at 298–99, 307 *N.W.2d* 761.]

*See also Shieman v. Lafayette Bank & Trust Co.*, 4 *Conn.App.* 39, 492 *A.2d* 219, 222 (1985) (holding that complaint against bank by heirs of intestate payee of check for negligent handling of that check stated no claim against bank absent "any contract, statute or circumstance which would give rise to a duty owed by [the bank] which would support an action in negligence.").

■ In short, in the check collection arena, unless the facts establish a special relationship between the parties created by agreement, undertaking or contact, that gives rise to a duty, the sole remedies available are those provided in the Code.

Agreement, undertaking and contact are distinct concepts. An agreement is essentially a meeting of the minds between two or more parties on a given proposition. *Black's Law Dictionary* 44 (6th ed.1991). An undertaking is the willing assumption of an obligation by one party with respect to another or a pledge to take or refrain from taking particular action. *Id.* at 1060. A contact is the loosest of the three terms, defined as the "establishment of communication with someone." *Webster's Ninth New Collegiate Dictionary* 282 (9th ed.1984). Both an agreement and an undertaking will give rise to a duty with respect to the subject agreed upon or undertaken. Whether a contact creates a duty is determined by its nature and surrounding circumstances.

## IV

■ The duty asserted here by Check Cashing was that the bank should have responded prior to the midnight deadline set forth in the U.C.C., more particularly within a reasonable time from the inquiry. The question is whether by virtue of an agreement, undertaking or contact, as described above, such duty devolved upon the Bank. We think not.

Plainly, there was no agreement between the Bank and Check Cashing establishing an obligation on the part of the bank to act. Check Cashing was a non-customer that placed an unsolicited call to a customer service line to verify whether a check in its possession was good. That set of facts established no special relationship based upon an agreement whereby the Bank contracted to respond prior to the U.C.C. midnight deadline.

Although there was an undertaking by McClellan to try to answer Slansky's inquiry, the critical undertaking—that she would respond prior to the midnight deadline—was lacking, as was a special relationship based on that undertaking.

What is left is the contact between McClellan and Slansky arising out of their conversation. The very underpinning of that conversation was Slansky's representation that she had a "problem" with the check because it appeared to be altered. Slansky's conversation with McClellan did nothing to disabuse her of the notion that Koci's check was, in fact, a problem. From the outset, McClellan told Slansky that there was something wrong with the certification serial number in that it did not begin with the proper letter. She did not assure Slansky in any way of the validity of the instrument. She merely asked that it be faxed to her to check on the certification and the alteration. McClellan never indicated that she would respond within a definite time, that she would only respond if there was a problem with the certification, or that if she did not respond, Check Cashing should feel free to negotiate the check.

Indeed, it is obvious that neither party to that conversation viewed it as establishing a particular temporal obligation to respond. Check Cashing's negotiation of the check, without even calling McClellan to ascertain whether it was good, reveals its lack of reliance on the conversation. On McClellan's part, it cannot be said that a reasonable person would have foreseen that Check Cashing would negotiate an almost $300,000 check within two hours on the basis of an open-ended conversation. She had absolutely no reason to suspect that Check Cashing would act in

the face of her silence. Thus, the Bank did not unreasonably create a risk of foreseeable harm for which fairness requires a remedy.

The structure of the U.C.C. itself is instructive in reaching that conclusion. Formal processes include presentment, acceptance, provisional and final payment, notice of dishonor, return and a "midnight deadline." The legislative choice of a fixed deadline is significant because it produces the commercial certainty that the free flow of commerce demands. In the absence of a specific agreement or undertaking by the Bank, or a "contact" clearly implying that the Bank would respond within a specified period of time earlier than permitted by the Code's midnight deadline, no duty can be said to have arisen. Simply stated, the Code's provisions should govern, and no articulable purpose is served in this case by departing from those provisions.

The fact that the check was certified does not change that result. Certified checks, like other items, are subject to the Code's midnight deadline provisions as contained in sections 4–301 and 4–302. The Code does not distinguish between certified checks and other checks. If the New York and New Jersey Legislatures had wished to vary from the Uniform Commercial Code with respect to processing certified checks, they certainly could have done so. In the absence of such legislative variation from the Code, there is no reason to create new rules for such instruments.

## V

■ Finally, even if we agreed with the Appellate Division that a duty was created on the part of the Bank to respond within a reasonable time, there remained no issue in this case to be tried by a jury. No fair minded jury could denominate as unreasonable the passage of only two hours after an unsolicited call by a noncustomer to a customer service line about a large, obviously altered check. *Ferdinand v. Agric. Ins. Co. of Watertown*, 22 *N.J.* 482, 493, 126 *A.*2d 323 (1956)(noting that "when the proof on a

question of fact is so strong as to admit of no reasonable doubt as to its existence ... there is no question for the jury to decide.").

## VI

The judgment of the Appellate Division is reversed. The order granting summary judgment in favor of the Bank is reinstated.

*For reversal and reinstatement*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, and LaVECCHIA—6.

*Opposed*—None.