**Richard SCHENKEL Appellant,**

v.

**Neal H. FLASTER; Fleet Bank, N.A.; Glenn M. Taylor; John Does 1–10; Weiner Lesniak.**

No. 02–1763.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1(a) Dec. 13, 2002.

Decided Dec. 18, 2002.

Before FUENTES and STAPLETON,

Circuit Judges, and O'KELLEY,* District Judge.

## OPINION

STAPLETON, Circuit Judge.

This appeal centers around the fraudulent behavior of Howard Handler in his Ponzi scheme involving Heart Tech, Inc. and Products for Health Care, Inc. (collectively, "Heart Tech"). Richard Schenkel ("Appellant") was an investor in the Ponzi scheme, who lost his investment when the scheme unraveled. Fleet Bank ("Fleet" or "Appellee") maintained a checking account for Handler and received a wire transfer from Appellant in the amount of $450,000. Appellant has sued for damages resulting from that transfer.

## I.

The Ponzi scheme operated as follows: Handler and others would elicit investments for an investment syndicate. The purported purpose of this syndicate was to purchase medical equipment, which would be quickly resold to physicians at a 20% return. Appellant first invested in Heart Tech in July 1997. He invested $120,000 with a return of $18,000 thirty days later. Though the payment to Appellant was delayed, he received his promised $138,000 on September 2, 1997, a couple of weeks after it had been due.

Handler advised Appellant of a second opportunity for investment in early September. The amounts in question were, of course, greater. Appellant's investment was to be $450,000 with a return of $90,000 in 60 days, a 20% profit. Handler signed a one-page contract for the loan and faxed it to Appellant on September 10, 1997. Appellant signed the new contract for the

loan and faxed it back to Handler on September 11. That same day, Appellant deposited $450,000 into his investment account and faxed a wire transfer order to his bank, authorizing the transfer. The transfer occurred the next day.

In the months previous, Heart Tech's account had been overdrawn on a number of occasions. When, on September 9, 1997, a number of Handler's personal checks bounced and the Heart Tech account into which they had been deposited went more than $500,000 into the red, Fleet initiated an investigation into possible check kiting. The Kite Division, headed by David Benner, determined that there was no evidence of check kiting, but that "something fishy" was going on. Therefore, he forwarded the account to the Fraud Department. Benner also advised the Large Deposit Return Department about the account and its overdraft problems. The head of that department, Ronald Browder, called Michael Johnson, the branch manager at the Fleet Bank in issue, to find out about the particulars of the situation.

During their conversation, Browder instructed Johnson to close the account to outgoing transfers, but to allow in-coming deposits to clear the overdraft. Johnson called Handler to discuss the overdrafts. Handler advised Johnson that a transfer for $450,000 should be arriving from the sale of medical equipment. Johnson requested confirmation and Handler gave Johnson the name of Appellant's attorney, Neal Flaster, so that he might confirm the transfer.

At 12:30 on September 12th, Johnson called Flaster to confirm the wire transfer. Flaster was not in the office, so Johnson left a message. At some point after 12:40,

---

* Honorable William C. O'Kelley, United States District Judge for the District of Northern Georgia, sitting by designation.

Flaster got the message and returned the phone call. During this conversation, Johnson made no mention of the overdraft in Heart Tech's account, nor did he mention that the bank had stopped authorizing outgoing transfers.

After the passage of some time, Johnson was fired, largely as a result of his behavior regarding Heart Tech and its overdrafts. He collected the file developed by the Kite Department regarding Heart Tech's account and put it in the vault. It was destroyed a year later.

The District Court ruled that the destruction of the files had not been intentional and denied Appellant's motion for a mandatory evidentiary presumption. Thereafter, it granted Appellee's motion for summary judgment.

## II.

In New Jersey,[1] "[t]he five elements of common-law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 691 A.2d 350, 367 (1997); *see Jewish Ctr. of Sussex County v. Whale,* 86 N.J. 619, 432 A.2d 521, 524–25 (1981). Negligent representation is "[a]n incorrect statement, negligently made and justifiably relied upon...." *H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A.2d 138, 142–43 (1983). "The actual receipt and consideration of

any misstatement remains central to the case of any plaintiff seeking to prove that he or she was deceived by the misstatement or omission." *Kaufman v. i-Stat Corp.,* 165 N.J. 94, 754 A.2d 1188, 1195 (2000).

■ Appellant cannot demonstrate that there is a genuine issue of material fact with respect to the existence of a misstatement. Appellant does not allege that Appellee ever spoke to or otherwise contacted him. The only contact between the parties was the phone call from Johnson to Flaster on the day of the wire transfer. Appellant does not argue that the call contained a misstatement; he does assert, however, that Johnson's failure to disclose that the Heart Tech account was overdrawn and that it had been closed to outgoing transfers was tantamount to a misstatement.

An omission is only a misstatement to which liability might attach where there was a duty to reveal the information concealed. *Weintraub v. Krobatsch,* 64 N.J. 445, 317 A.2d 68, 71 (1974) (stating that "silence may be fraudulent and that relief may be granted to one ... party where the other suppresses facts which he, under the circumstances, is bound in conscience and duty to disclose to the other party, and in respect to which he cannot, innocently, be silent")(internal quotations omitted). Thus, the question becomes whether Fleet had a duty to inform Flaster that the account was overdrawn and had been closed to outgoing transactions.

"In general, courts have recognized tort liability of a financial institution where a

1. The choice of law rules that a district court should apply in a diversity action are those of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Shuder v. McDonald's Corp.,* 859 F.2d 266, 269 (3d Cir. 1988). The New Jersey Supreme Court has stated that "[t]o resolve the choice-of-law question, [a court] must evaluate the respective interests of the two involved states to

determine the state that has the most significant interest...." *Erny v. Estate of Merola,* 171 N.J. 86, 792 A.2d 1208, 1211 (2002). In our case, the only other state that could conceivably have an interest is Massachusetts, the domicile of the Appellant. However, New Jersey has a far greater interest since the bank, the defrauder, and the defrauder's scheme all took place in New Jersey. Thus, New Jersey law applies.

special relationship has been established from which a duty can be deemed to flow." *City Check Cashing, Inc. v. Manufacturers Hanover Trust Co.,* 166 N.J. 49, 764 A.2d 411, 417 (2001). "Absent a special relationship, courts will typically bar claims of non-customers against banks." *Id.* Appellant does not allege that a fiduciary relationship existed. Appellant does not argue that a "special relationship" existed. Appellant asserts only that there is a "growing trend to impose a duty to disclose in many circumstances in which silence historically sufficed." *United Jersey Bank v. Kensey,* 306 N.J.Super. 540, 704 A.2d 38, 45 (1997). This observation was made, however, in reference to "those situations in which one of the parties expressly reposes a trust or confidence in the other or because of the circumstances, such a trust or confidence is ... necessarily implied." *Id.* (omissions in original and internal quotations omitted). There is no evidence of Appellant's having "repos[ed] a trust or confidence," nor is there any evidence that would lead to the conclusion that it should be implied.

### III.

Conversion is "the exercise of any act of dominion in denial of another's title to the chattels, or inconsistent with such title." *Mueller v. Technical Devices Corp.,* 8 N.J. 201, 84 A.2d 620, 623 (1951). Appellant argues that since he never intended to deliver funds for Fleet's use and the account was closed to outgoing transfers, the bank exercised dominion over his money when it applied it to set off the overdraft. However, in order to assert a claim for conversion, Appellant must establish that he retained title to the money. Appellant cites no cases and poses no argument beyond the above assertion.

▮ Under New Jersey's version of the UCC, a funds transfer is considered completed and payment effected "(i) at the time a payment order for the benefit of the beneficiary (Heart Tech) is accepted by the beneficiary's bank in the funds transfer and (ii) in an amount equal to the amount of the order accepted by the beneficiary's bank, but not more than the amount of the originator's order." N.J.S.A. 12A:4A–406(1). The fact that outgoing transfers from the account may have been temporarily suspended is irrelevant; the money had become the property of Heart Tech. Since the money was no longer Appellant's property, Appellant's claim for conversion must fail.[2]

We will affirm the judgment of the District Court.

---

**2.** Appellant faults the District Court for failing to address his claim for unjust enrichment. We find no claim for unjust enrichment in the complaint. Moreover, such a claim is not viable for the same reason that the conversion claim fails; the property was no longer his.