18 A.3d 1033 (2011)
420 N.J. Super. 39
ESTATE OF Nancy Z. PALEY, Plaintiff-Appellant/Cross-Respondent,
v.
BANK OF AMERICA (f/k/a Fleet Bank, f/k/a First Jersey Bank, f/k/a Westminster Bank, f/k/a Summit Bank), Defendant-Respondent/Cross-Appellant, and
Angela Sentore, Defendant.
No. A-4391-07T3.
Superior Court of New Jersey, Appellate Division.
Argued January 6, 2010.
Decided April 29, 2011.
*1034 Lavinia Lee Mears argued the cause for appellant/cross-respondent (Stein, McGuire, Pantages & Gigl, LLP and Kologi & Simitz, attorneys; Ms. Mears and Michael S. Simitz, Linden, of counsel; Ms. Mears, on the brief).
Gregg S. Sodini, Edison, argued the cause for respondent/cross-appellant (Law Offices of Gregg S. Sodini, LLC, attorneys; Mr. Sodini and Daniel Barros, Manalapan, on the brief).
Madeline L. Houston argued the cause for amicus curiae Consumers League of New Jersey (Houston & Totaro, attorneys; Ms. Houston and Melissa J. Totaro, on the brief).
Michael D. Halbfish, Woodbridge, argued the cause for amici curiae New Jersey Association for Justice and AARP (Tunney & Halbfish and David M. Cedar, attorneys for New Jersey Association for Justice; Fred Shahrooz Scampato, Westfield, and Julie Nepveu, of the District of Columbia bar, admitted pro hac vice, attorneys for AARP; Mr. Cedar, Mr. Halbfish, Ms. Nepveu and Mr. Scampato, on the joint brief).
Before Judges CUFF, PAYNE and C.L. MINIMAN.
The opinion of the court was delivered by
CUFF, P.J.A.D.
Plaintiff Nancy Z. Paley[1] hired a home health aide to assist her after she *1035 lost a leg to diabetes. In 2005, plaintiff discovered that the home health aide had fraudulently negotiated checks drawn on plaintiff's money market account with defendant Bank of America (BOA). In this appeal, we are asked to address whether the evidence presented by plaintiff supports a consumer fraud claim against defendant bank, and, if so, if it is preempted by the Uniform Commercial Code (UCC). We hold that the acts or business practices alleged by plaintiff are not the type of acts or business practices encompassed by the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -20. In doing so, we hold that, absent a special relationship between the customer and the bank, the application of the CFA to the various claims asserted by plaintiff against defendant bank would conflict with the comparative negligence provisions of the UCC, would dilute the protections afforded to banks by the UCC, and would likely lead to inconsistent jury verdicts. We, therefore, affirm the judgment notwithstanding the verdict (JNOV) entered by the trial judge.

I
Plaintiff opened a money market account in her name about thirty-five years ago with a predecessor of defendant BOA.[2] When she opened the account, she signed a signature card. She testified that personnel at the bank told her the signature card would be used to check the signatures on checks presented for cashing. Plaintiff denied the bank ever informed her that it would not verify signatures on checks drawn on her account or use an automated system to guard against fraudulent activity in her account. Plaintiff recalled being advised that the bank would exercise reasonable care to prevent forged checks from being drawn on her account.
At trial, Ruta Karlson, a BOA representative, conceded the signature card could not be located. She also admitted that normal practice within the bank calls for a customer to sign a new card when the bank cannot locate the original. Plaintiff testified she was never told the original card could not be located, but admitted she had no recollection of what the bank represented concerning its policies, procedures, and reasonable commercial practices. She recalled the bank giving her "very little information.... It was one, two, three, four, and we're out of here."
As a money market account, federal Regulation D[3] governed its use, and allowed only three checks per month to be drawn on the account. Plaintiff used the account infrequently, no more than several times per year. She maintained a checking account with which she paid her ongoing bills. Plaintiff received statements on the money market account only when there had been activity on the account. In 2002, the account balance was over $45,000.
After losing a leg to diabetes at the age of seventy-four, plaintiff needed assistance. At the beginning of 2002, she hired Angela Sentore[4] as a home health aide. Sentore did various jobs for plaintiff, including making deposits at the bank. Plaintiff did *1036 not authorize her to undertake any other transactions.
In June 2005, plaintiff learned that a check she wrote to her husband on the money market account had been returned for insufficient funds. Because plaintiff expected the funds on deposit to easily cover the amount of the check, she investigated by ordering copies of all negotiated checks, and learned that Sentore had negotiated 188 checks from the account, totaling $48,931.83, either by making them payable to herself, or by making them payable to third parties. Sixty-two of the checks were presented in person by Sentore to a teller at a BOA branch office.
In many instances Sentore wrote more than three checks a month on this account. When an account holder exceeds the three-check limit, the bank issues a written notice. If it happens a second time, the bank sends another written notice to the account holder. If it occurs a third time, the bank converts the account from an interest-earning money market account to a checking account. The conversion may also be preceded by a telephone call from bank personnel to the customer. Plaintiff testified she received no letters and was not aware the account had been converted to a regular checking account. Karlson, on behalf of BOA, testified bank records indicated that notices were sent to plaintiff.
Plaintiff confronted Sentore, who admitted writing and negotiating checks on the money market account. Plaintiff filed a fraud claim with BOA, which it denied. BOA advised plaintiff she waited too long to report the missing funds, as she received statements, did not notify the bank of the problem upon receipt of the statements, and the "same wrongdoer" perpetrated the fraud. Plaintiff claimed she did not receive any statements and mostly did not expect to, given her limited use of the account. However, between 2002 and 2005, plaintiff called the bank approximately five times to report she had not received an expected statement. She testified the bank stated it would send another statement. She never received the requested copies and realized only in July 2005 that Sentore monitored the mail and intercepted all communications from the bank.
Plaintiff always signed her name with the middle initial "Z," but none of the forged checks contained her middle initial. Plaintiff contended, and Karlson conceded, that plaintiff's legitimate signature was noticeably different from the forged signature. Karlson admitted the bank did not sight-review every check to compare it to the signature card because the bank handled too many checks to make this practical. In accordance with bank policy, it did not verify signatures on checks made out for less than $500. Karlson maintained that under bank policy, a teller was under no obligation to compare each signed check to a signature card due to the low amounts of the checks. Karlson also reviewed the bank policies for detecting fraud, and opined that the bank followed those policies and none of the checks would have triggered a warning or a "red flag."
The BOA "Personal Deposit Account Agreement" sets forth the check processing standard of care. It stated:
We use automated systems that don't rely on sight review in the processing of checks in order to handle a high volume of items at a lower cost to you. You agree that, to the extent that such systems are consistent with general banking practice, their use will constitute ordinary care and we will not be liable to you for forgeries or alterations not detected by such systems. You also agree that the exercise of ordinary care will not require detecting forgeries or alterations that could not be detected by a *1037 person observing reasonable commercial standards.
This agreement was in force at BOA in 2005. Karlson testified the provision reflected the standard of care in effect between 2002 and 2005.
On May 10, 2006, plaintiff filed a complaint against BOA and Sentore. The first six counts of the complaint were against BOA and sought damages for: 1) negligence (count one); 2) breach of fiduciary duty (count two); 3) breach of contract (count three); 4) detrimental reliance (count four); 5) violation of N.J.S.A. 12A:3-420 (the UCC) (count five); and 6) violation of the CFA (count six). Plaintiff sought damages from BOA and Sentore for fraud and misrepresentation in count seven and against Sentore for conversion in count eight. The court granted BOA's motion for summary judgment in part and dismissed counts one (negligence), two (breach of fiduciary duty), seven (fraud and misrepresentation), and eight (conversion).[5] The court denied summary judgment to BOA on counts three (breach of contract), four (detrimental reliance), five (UCC), and six (the CFA claim). The motion judge reasoned that a liberal interpretation of the CFA would cover the bank services of "handling of negotiable instruments" and the "[c]ashing of checks," and BOA had not rebutted the presumption that the CFA applied. Finally, the judge dismissed all claims based on checks negotiated prior to August 31, 2004, based on N.J.S.A. 12A:4-406f, which provides that "a customer who does not within one year after the statement or items are made available to the customer ... discover and report the customer's unauthorized signature... is precluded from asserting against the bank the unauthorized signature...."
A jury trial was held on counts three, four, five, and six in February 2008 before Judge Dupuis. After both parties rested, plaintiff voluntarily dismissed all claims except the consumer fraud claim. BOA moved to dismiss this claim prior to the jury's deliberations under Rule 4:37-2, arguing that plaintiff showed no right to relief, but the judge reserved ruling until after the jury verdict.
The jury found that BOA committed a violation of the CFA, and awarded $8500 in damages. After the verdict, the judge denied BOA's motion for dismissal. However, because the damages awarded by the jury exceeded the possible award as instructed by the judge, the judge asked both parties to brief the issue of remittitur. By letter dated February 11, 2007, plaintiff consented to a remittitur, if damages were found to be $3702 and trebled under the CFA, and without prejudice to her right to appeal the ruling that limited her damages to checks negotiated after August 31, 2004.
On February 27, 2008, BOA moved for JNOV pursuant to Rule 4:40-2. After oral argument on March 28, 2008, the judge found that the UCC provided "a remedy for the precise situation presented with explicit rules," and therefore granted BOA's JNOV motion on April 2, 2008. In her opinion, the judge stated that factual questions concerning negligence remained, and ordered a new trial; however, plaintiff had voluntarily dismissed all claims other than the CFA claim, and the judge entered a final judgment at plaintiff's request. Subsequently, the judge denied BOA's motion for counsel fees and costs pursuant to Rule 1:4-8 and Rule 4:46-6.

II
Plaintiff seeks to invoke the CFA based on the premise that the signature card she *1038 executed in the 1970s when she opened her money market account was designed to prevent acts of fraud and misrepresentation. In other words, she contends that the purpose of the signature card was to prevent the bank from charging her account for a check bearing an unauthorized signature. This argument also assumes that each check presented by a customer is visually scanned. Plaintiff further contends that BOA failed to inform her of changes in its fraud prevention and detection practices to her detriment. In order to evaluate this argument, we consider the purpose of the CFA, the scope of Articles 3 and 4 of the UCC, and whether the CFA applies to this case.

A. The Consumer Fraud Act
The CFA, originally enacted in 1960, "is aimed basically at unlawful sales and advertising practices designed to induce consumers to purchase merchandise or real estate." Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 270, 390 A.2d 566 (1978). It provides:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice....
[N.J.S.A. 56:8-2.]
"Merchandise" is defined as "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale...." N.J.S.A. 56:8-1(c).
The Supreme Court explained the scope of the CFA in Daaleman, supra, 77 N.J. at 271, 390 A.2d 566:
The act as amended and supplemented is administered by the Division of Consumer Affairs, Department of Law and Public Safety. N.J.S.A. 52:17B-124. Detailed administrative regulations have been adopted pursuant to the act, controlling selling and advertising practices in the areas of consumer sales which are subject to the act. N.J.A.C. 13:45A-1.1 [to -31.10].
The act provides for injunctive relief against unlawful practices, N.J.S.A. 56:8-8, monetary penalties for violation of the act, N.J.S.A. 56:8-13, and also permits a person, who suffers a loss due to a method, act or practice declared unlawful under the act, to sue and recover threefold the damages sustained, together with reasonable attorney's fees and costs of suit. N.J.S.A. 56:8-19.
"The legislative concern was the victimized consumer...." Channel Cos. v. Britton, 167 N.J.Super. 417, 418, 400 A.2d 1221 (App.Div.1979). The purposes of the CFA are: 1) to compensate the victim for his or her actual loss; 2) to punish the wrongdoer through the award of treble damages; and 3) to attract competent counsel to counteract the "community scourge" of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual. Scibek v. Longette, 339 N.J.Super. 72, 77, 770 A.2d 1242 (App.Div.2001). Thus, the CFA seeks "not only to make whole the victim's loss, but also to punish the wrongdoer and to deter others from engaging in similar fraudulent practices." Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 12, 860 A.2d 435 (2004).
The CFA is to be "applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud." *1039 Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 264, 696 A.2d 546 (1997). Further, the CFA is to be liberally construed in favor of the consumer. Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139, 741 A.2d 591 (1999). However,
[i]n reading and interpreting a statute, primary regard must be given to the fundamental purpose for which the legislation was enacted. Where a literal rendering will lead to a result not in accord with the essential purpose and design of the act, the spirit of the law will control the letter.
[N.J. Builders, Owners & Managers Ass'n v. Blair, 60 N.J. 330, 338, 288 A.2d 855 (1972).]
Consistent with its stated purpose to address unlawful sales and advertising practices designed to induce consumers to enter consumer transactions, the Supreme Court has extended the sweep of the CFA to consumer loan transactions offered by financial institutions. In Lemelledo, the Court addressed whether the CFA was an available remedy to address a "loan packing" practice of a lender. 150 N.J. at 259-60, 696 A.2d 546. The plaintiff requested a student loan, and when she received the loan proceeds, the principal amount to be repaid included unrequested and unexpected premiums for credit insurance, a practice called "loan packing." Ibid. The Court found that by its terms, the CFA was applicable to the provisions of credit because its definition of "advertisement" specifically included "loans," and its definition of "merchandise" as "anything offered, directly or indirectly to the public for sale" was "more than sufficiently broad to include the sale of credit." Id. at 265, 696 A.2d 546. Additionally, the CFA was sufficiently broad to "encompass the sale of insurance policies as goods and services that are marketed to consumers." Ibid.
The fact that the CFA could cover loans and insurance, however, did not automatically mean that the CFA applied, as the Court had to address the contention that because lenders offering credit insurance were regulated by several state agencies, subjecting them to CFA liability might "run counter to our traditional reluctance to impose potentially inconsistent administrative obligations on regulated parties." Id. at 266, 696 A.2d 546.
The Court in Lemelledo stated that application of the CFA to credit insurers would not be barred simply because multiple agencies subjected the sellers to regulations, but instead, a court must determine whether there is a "real possibility" of conflict between the agencies if the CFA were to apply to a particular practice. Id. at 268, 696 A.2d 546. The Court created a presumption that the CFA applied to a covered practice, and imposed the requirement that to overcome the presumption, a court must be satisfied that a "direct and unavoidable conflict" existed between the application of the CFA and other regulatory schemes. Id. at 270, 696 A.2d 546.
It must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes. We stress that the conflict must be patent and sharp, and must not simply constitute a mere possibility of incompatibility.
[Ibid.]
In applying that standard, the Court found that despite the jurisdiction of the Insurance Trade Practices Act, the Insurance Producers Licensing Act, and the Credit Life and Health Insurance Act over the credit insurance industry, those acts were complementary to, and not in conflict with, the CFA. Id. at 271-73, 696 A.2d 546.

*1040 B. The Uniform Commercial Code
The UCC, N.J.S.A. 12A:1-101 to 12-26, concerns "commercial transactions." N.J.S.A. 12A:1-102. Article 3 of the UCC, N.J.S.A. 12A:3-101 to -605, governs negotiable instruments, and Article 4, N.J.S.A. 12A:4-101 to -504, governs bank deposits and collections. "Articles 3 and 4 of the UCC set forth the rights, duties and liabilities of banks and customers concerning commercial paper." Travelers Indem. Co. v. Good, 325 N.J.Super. 16, 21, 737 A.2d 690 (App.Div.1999). Basically, these articles, particularly Article 4, confirm the existence of a debtor-creditor relationship between the bank and its depositor. 2 White & Summers, Uniform Commercial Code, § 21-1 (5th ed.2008).
Originally adopted in 1961, Article 4 was substantially revised by the American Law Institute and the National Conference of Commissioners on Uniform State Laws in 1990 due to development of an automated system for check collection based on encoding checks with machine readable information by Magnetic Ink Character Recognition (MICR). N.J.S.A. 12A:4-101, UCC Comment 2. The explosion of commercial activity between 1950 and 1990, including the dramatic increase in checks written during that period, required the new automated system. Ibid. Accordingly, an important goal of the 1990 revision of Article 4 was to promote the efficiency of the check collection process by increasing the speed and decreasing the cost of check collections. Ibid. An additional goal of the 1990 revision was "to remove any statutory barriers in the Article to the ultimate adoption of programs allowing the presentment of checks to payor banks by electronic transmission of information captured from the MICR line on the checks." Ibid.
The history and purposes of Articles 3 and 4 of the UCC is clearly explained by A. Brooke Overby in a 2005 article. The author explains that the original UCC "contemplated a paper-based system with a largely manual collection system," but over the years, check volume "exploded" and processing became "highly mechanized." A. Brooke Overby, Check Fraud in the Courts After the Revisions to U.C.C. Articles 3 and 4, 57 Ala. L.Rev. 351, 354 (2005). The revisions to Articles 3 and 4 in 1990 were meant to address these changes. Ibid. The author notes that losses in the check-based system occurred most often due to forged or unauthorized signatures, and the UCC was meant to allocate the losses between the possible parties. Id. at 356-58.
The author also notes that historically, the loss was placed on the first party who dealt with the thief, generally the bank that accepted the check. Id. at 358-59. This loss allocation was based on the principle that losses due to fraud ought to be placed on the party best able to avoid the losseither the bank that dealt with the thief face-to-face, or the bank that was in possession of a signature card of the drawer. Id. at 359. However, now, checks are "usually processed in bulk and are guided not by human hands" but rather by a MICR encoding on the check. Id. at 360. "Payor banks rarely examine every check, or even a significant number of checks, presented for payment on any given day." Ibid. Moreover, paper checks are often not transferred through the collection system; electronic transmission has replaced the former method. Ibid. The author notes that, "[i]n an automated era, the notion that payor banks in fact do, or should, individually compare the drawer's signature(s) on file with that on the paper checks presented for payment is quite tenuous." Id. at 360-61.
Articles 3 and 4, as revised, were adopted in this State in 1995. Article 3 applies to checks payable on demand and drawn on a bank. N.J.S.A. 12A:3-104f. *1041 Article 4 defines the rights, duties, and liabilities between parties to bank deposits and collections. N.J.S.A. 12A:4-101, UCC Comment 3. It is "intended to create a legal frame-work that accommodates automation and truncation for the benefit of all bank customers." Ibid. To address these changes, Article 4 proceeds to assign various responsibilities to each party to the bank deposit and collections relationship. In doing so, the parties to a banking deposit agreement may negotiate an individual agreement to govern their tailored relationship but the bank "cannot disclaim [its] responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure." N.J.S.A. 12A:4-103a.
In addition, the Legislature provided that the measure of a party's action or inaction is ordinary care. N.J.S.A. 12A:4-103c. It also adopted a new definition of "ordinary care," N.J.S.A. 12A:4-104c, and provided that the measure of damages for failure to exercise ordinary care in handling an item, such as a check, "is the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care," N.J.S.A. 12A:4-103e.
Ordinary care is defined as follows:
In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by [Article 3] or [Article 4].
[N.J.S.A. 12A:4-104c.]
See also N.J.S.A. 12A:3-103a(7). This provision specifically provides as a reference "general banking usage." A lack of ordinary care "may be established by proof either that the bank's procedures were below standard or that the bank's employees failed to exercise care in processing the items." N.J. Steel Corp. v. Warburton, 139 N.J. 536, 546, 655 A.2d 1382 (1995); Travelers Indem. Co., supra, 325 N.J.Super. at 22, 737 A.2d 690.
In order for a payor to be absolved of liability, it must show that it acted in accordance with reasonable commercial standards and exercised ordinary care. Travelers Indem. Co., supra, 325 N.J.Super. at 22, 737 A.2d 690. "A bank must use reasonable and proper methods to detect forgeries, but `the tellers and bookkeepers of the bank are not held to a degree of expertness which a handwriting expert possesses.'" Id. at 22-23, 737 A.2d 690 (quoting Clarke v. Camden Trust Co., 84 N.J.Super. 304, 310, 201 A.2d 762 (Law Div.1964), aff'd o.b., 89 N.J.Super. 459, 215 A.2d 381 (App.Div.1965)).
In its allocation of responsibilities between the bank and its customer, "the UCC established a comparative negligence test in which losses are allocated between the customer and the bank if each has failed to comply with its respective duties." Id. at 21, 737 A.2d 690. Article 4 provides that a bank may charge a customer's account for properly payable items and may not charge the account for an item that is not properly payable. N.J.S.A. 12A:4-401a. In turn, the customer assumes a duty to review statements of account sent to her with "reasonable promptness" and determine whether any payment was unauthorized and notify the bank. N.J.S.A. 12A:4-406c. Notably, if the customer does not notify the bank of an unauthorized signature within thirty days after receipt of the statement of account, the customer is precluded from asserting a claim against the bank for processing a check with an unauthorized signature. N.J.S.A. 12A:4-406d(2); Travelers Indem. Co., supra, 325 *1042 N.J.Super. at 23, 737 A.2d 690; see also N.J.S.A. 12A:3-406.
If a customer is precluded from asserting an unauthorized signature based on N.J.S.A. 12A:4-406d(2), the customer may still prove that the bank failed to exercise ordinary care in paying the item and that failure substantially contributed to the loss. Travelers Indem. Co., supra, 325 N.J.Super. at 23, 737 A.2d 690. If the bank fails to exercise ordinary care, the comparative negligence test set forth in N.J.S.A. 12A:4-406e, in which the loss is allocated between the customer and the bank, applies. Ibid. "If the customer proves that the bank did not pay the item in good faith, the preclusion under [4-406d] does not apply." Ibid.
There is no question that in appropriate circumstances, a CFA claim can be brought in addition to a UCC claim, and can be brought against a bank. The fundamental question is whether the bank's acts and omissions that conform to general banking practices and procedures can be considered behavior that runs afoul of the CFA.
To be sure, banks are in the business of attracting and retaining customers, and offer various rewards and services to those who open accounts. However, while Lemelledo sets out the framework for determining whether there is a conflict between the CFA and another statute, we cannot accept plaintiff's argument that Lemelledo stands for the proposition that any claim against the banking industry involving a retail bank's core function of receipt of a depositor's funds and the presentation and processing of personal and business checks, absent a specific agreement between the bank and its depositors in which the bank assumes additional responsibility to the depositor, also invokes the CFA. In fact, the analysis of the Supreme Court rejects this notion as it carefully considered whether a consumer loan transaction falls within the ambit of the CFA. Lemelledo, supra, 150 N.J. at 263-66, 696 A.2d 546.
Plaintiff maintains that her claim is not based on the ordinary business of deposits and collections but on the bank's misrepresentations and omissions regarding its fraud detection procedures. The AARP argues plaintiff's claim is "completely independent" of the bank's handling of negotiable instruments.
At root, plaintiff's claim is founded on the evolution of the manner in which her bank processed checks and its failure to expressly advise her that the explosion of commercial activity over the years, the need to process commercial paper more efficiently and quickly, and advances in technology altered the manner in which checks were processed and made the initially executed signature card virtually obsolete as a fraud detection device. This very evolution, perhaps even commercial revolution, required a wholesale revision of the UCC articles governing commercial paper, bank deposits, and the relationship between the bank and its customer. We are loathe to hold that a bank that processes checks in accordance with the governing provisions of the UCC and applicable federal regulations has engaged in an unconscionable business practice by adapting its check processing procedures to meet the demands of modern commerce. Yet that is the essence of plaintiff's claim. Furthermore, plaintiff has failed as a matter of law to establish a special relationship. City Check Cashing, Inc. v. Mfrs. Hanover Trust Co., 166 N.J. 49, 62, 764 A.2d 411 (2001). In short, we hold observance of practices deemed commercially reasonable by the UCC simply does not invoke the CFA and its laudable remedies.
Even if the CFA applied to plaintiff's claim, the essence and purpose of the UCC particularly Articles 3 and 4 as revised, *1043 counsels against providing additional remedies to address plaintiff's basic claim. The UCC, "augmented by federal regulation, provides a comprehensive framework for allocating and apportioning the risks of handling checks," and the New Jersey Legislature has "made policy choices in allocating liability in the collection of checks." Id. at 57, 764 A.2d 411. Our Supreme Court has recognized that, "`[o]nly in very rare instances should a court upset the legislative scheme of loss allocation and permit a common law cause of action.'" Id. at 58, 764 A.2d 411 (quoting Bank Polska Kasa Opieki v. Pamrapo Sav. Bank, 909 F.Supp. 948, 956 (D.N.J. 1995)). "Courts should be hesitant to improvise new remedies outside the already intricate scheme of Articles 3 and 4." Ibid. (quoting Girard Bank v. Mount Holly State Bank, 474 F.Supp. 1225, 1239 (D.N.J.1979)). Despite this "need for restraint" the Court recognized that a common law duty may arise and that its breach may be actionable in spite of the UCC. Id. at 59, 764 A.2d 411. "The question of whether a duty exists is a matter of law to be decided by the court." Ibid.
Interestingly, the drafters of the 1990 revision to both articles recognized that the benefits afforded by automation to banks and its customers may raise "consumer problems" that jurisdictions adopting the 1990 revisions might want to address through legislation. N.J.S.A. 12A:4-101, UCC Comment 3. Indeed, the drafters suggested that one area of concern was "the fact that under various truncation plans customers will no longer receive their cancelled checks and will no longer have the cancelled checks to prove payment." Ibid. The drafters suggested that a state adopting the 1990 revision "might provide that a copy of a bank statement along with a copy of the check is prima facie evidence of payment." Ibid.
To support her argument that the CFA can apply in the face of the UCC, plaintiff points to this comment and N.J.S.A. 12A:1-103, which states:
Unless displaced by the particular provisions of this Act, the principles of law and equity, including law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.
Plaintiff seizes on this language to support her argument that the CFA applies to her specific claims.
We find no support in either the text of N.J.S.A. 12A:1-103 or the official comment for this proposition, particularly in this factual context. Rather, we interpret the official comment as an invitation to state legislatures to provide additional consumer protections in the version of the uniform code they eventually adopted.
In addition, only two of the numerous citations plaintiff provides actually concern the banking industry. See City Check Cashing, supra, 166 N.J. at 59, 764 A.2d 411 (stating despite restraint courts should exercise in providing new remedies outside the UCC, "a common law duty, in fact, may arise and ... [its] breach may be actionable in spite of the existence of the [UCC]"); Pa. Nat'l Turf Club v. Bank of W. Jersey, 158 N.J.Super. 196, 203, 385 A.2d 932 (App.Div.) ("We recognize that although a bank has complied with the Code provisions, such compliance does not necessarily immunize it from ordinary tort liability."), certif. denied, 77 N.J. 506, 391 A.2d 520 (1978). Other cases not involving banks recognize that in some cases, common law claims can be brought despite other UCC claims. See Coastal Grp. v. Dryvit Sys., 274 N.J.Super. 171, 177, 643 A.2d 649 (App.Div.1994) (holding that "the *1044 UCC expressly preserves a buyer's right to maintain an action for fraud and misrepresentation" with regard to the marketing of prefabricated panels), appeal granted in part and summarily remanded, 147 N.J. 574, 688 A.2d 1050 (1997); D'Angelo v. Miller Yacht Sales, 261 N.J.Super. 683, 686, 619 A.2d 689 (App.Div.1993) (holding that the UCC saves from preemption common law fraud and CFA claims arising from sales transaction).
Furthermore, many of plaintiff's arguments in support of her contention that the CFA should apply are couched in terms of the reasonableness of the bank's conduct and whether the bank exercised ordinary care. To the extent plaintiff seeks to hold BOA to a standard of reasonableness and ordinary care different than the UCC standard, she creates an irreconcilable conflict with the code specifically designed to bring uniformity to commercial transactions. We also note that plaintiff dismissed her UCC claims.

* * * * * *
[At the direction of the court, the discussion of the other issues in the appeal has been omitted from the published version of the opinion.]

* * * * * *
Affirmed.
NOTES
[1] Nancy Paley died during this litigation, and her estate has continued to prosecute this appeal. We have elected to use the original party names in this opinion.
[2] Plaintiff opened her account with another bank that became BOA after a series of mergers and acquisitions. Based on plaintiff's testimony and records maintained by the State of New Jersey Department of Banking & Insurance, the account may have been opened initially at a branch of Summit Bank or a branch of NatWest Bank. State of N.J. Dep't of Banking & Ins., N.J. Bank Mergers, http:// www.state.nj.us/dobi/bankmerger_alpha.htm (last visited Apr. 12, 2011).
[3] 12 C.F.R. § 204.2(d)(2).
[4] The name of the aide has been spelled "Senatore" in various contexts.
[5] Count eight addresses Sentore specifically. Nevertheless, BOA sought, and the motion judge granted, summary judgment to BOA on this count.